NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12376


EXXON MOBIL CORPORATION  vs.  ATTORNEY GENERAL.



Suffolk.     December 5, 2017. - April 13, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Attorney General.  Consumer Protection Act, Investigative
     demand.  Jurisdiction, Personal, Foreign corporation, Long-
     arm statute.  Due Process of Law, Jurisdiction over
     nonresident.



     Motion filed in the Superior Court Department on June 16,
2016.

     The proceeding was heard by Heidi E. Brieger, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Justin Anderson, of the District of Columbia (Jamie D.
Brooks & Theodore V. Wells, Jr., of New York, Thomas C.
Frongillo, & Caroline K. Simons also present) for the plaintiff.
     Richard A. Johnston, Assistant Attorney General (Melissa A.
Hoffer, I. Andrew Goldberg, Christopher G. Courchesne, Peter C.
Mulcahy, & Seth Schofield, Assistant Attorneys General, also
present) for the defendant.
     Wendy B. Jacobs & Shaun A. Goho, for Francis X. Bellotti &
others, amici curiae, submitted a brief.

Archis A. Parasharami, of the District of Columbia, & Steven P. Lehotsky, for Chamber of Commerce of the United States of America, amicus curiae, submitted a brief.

CYPHER, J.  In 2015, news reporters released internal documents from Exxon Mobil Corporation (Exxon) purporting to show that the company knew, long before the general public, that emissions from fossil fuels -- Exxon's principal product -- contributed to global warming and climate change, and that in order to avoid the consequences of climate change it would be necessary to reduce drastically global fossil fuel consumption. The documents also purported to establish that despite Exxon's knowledge of climate risks, the company failed to disclose that knowledge to the public, and instead sought to undermine the evidence of climate change altogether, in order to preserve its value as a company.

Upon reviewing this information, the Attorney General believed that Exxon's marketing or sale of fossil fuel products in Massachusetts may have violated the State's primary consumer protection law, G. L. c. 93A.  Based on her authority under G. L. c. 93A, § 6, the Attorney General issued a civil investigative demand (C.I.D.) to Exxon, seeking documents and information relating to Exxon's knowledge of and activities related to climate change.

Exxon responded by filing a motion in the Superior Court, pursuant to G. L. c. 93A, § 6 (7), seeking to set aside or modify the C.I.D. Exxon argued that (1) Exxon is not subject to personal jurisdiction in Massachusetts; (2) the Attorney General is biased against Exxon and should be disqualified; (3) the C.I.D. violates Exxon's statutory and constitutional rights; and (4) Exxon's Superior Court case should be stayed pending a ruling on Exxon's request for relief in Federal court.[1] The Attorney General cross-moved to compel Exxon to comply with the C.I.D. A Superior Court judge denied Exxon's motion and allowed the Attorney General's cross motion to compel. Exxon appealed, and we transferred the case from the Appeals Court on our own motion. We conclude that there is personal jurisdiction over Exxon with respect to the Attorney General's investigation, and that the judge did not abuse her discretion in denying Exxon's requests to set aside the C.I.D., disqualify the Attorney General, and issue a stay. We affirm the judge's order in its entirety.[2]

---

[1] One day before filing its instant Superior Court motion, Exxon filed a complaint for declaratory and injunctive relief in the United States District Court for the Northern District of Texas, challenging the C.I.D. on constitutional grounds not raised in this action. Exxon Mobil Corp. vs. Healey, U.S. Dist. Ct., No. 4:16-CV-469 (N.D. Tex. June 15, 2016).

[2] We acknowledge the amicus briefs submitted by five former Massachusetts Attorneys General and the Chamber of Commerce of the United States of America.

1.  Personal jurisdiction.  Exxon's primary argument is that, as a nonresident corporation, it is not subject to personal jurisdiction in Massachusetts.  For a nonresident to be subject to the authority of a Massachusetts court, the exercise of jurisdiction must satisfy both Massachusetts's long-arm statute, G. L. c. 223A, § 3, and the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution.  SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324, 325 (2017).  The Attorney General "has the burden of establishing the facts upon which the question of personal jurisdiction over [Exxon] is to be determined."  Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 151 (1978), quoting Nichols Assocs. v. Starr, 4 Mass. App. Ct. 91, 93 (1976).

A business is a "resident," and therefore subject to the forum's general jurisdiction, if the business is domiciled or incorporated or has its principal place of business in the forum State.  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011).  Exxon is incorporated in New Jersey and headquartered in Texas.  Because "[t]he total of [Exxon's] activities in Massachusetts does not approach the volume required for an assertion of general jurisdiction," Tatro v. Manor Care, Inc., 416 Mass. 763, 772 n.6 (1994), citing Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 413-416 (1984), our inquiry in this case concerns the exercise

of specific jurisdiction. This requires an "affiliatio[n] between the forum and the underlying controversy" (citation omitted). Goodyear Dunlop Tires Operations, S.A., supra at 919. See G. L. c. 223A, § 3 (granting jurisdiction over claims "arising from" certain enumerated grounds occurring within Massachusetts); Tatro, supra at 772, citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) ("The plaintiff's claim must arise out of, or relate to, the defendant's forum contacts").

Exxon denies any such affiliation in this case, contending that it "engages in no suit-related conduct" in Massachusetts. Here there is no "suit," however, as this matter involves an investigation -- a precursor to any formal legal action by the Attorney General. So while our typical inquiry asks whether there is a nexus between the defendant's in-State activities and the plaintiff's legal claim(s), the investigatory context requires that we broaden our analysis to consider the relationship between Exxon's Massachusetts activities and the "central areas of inquiry covered by the [Attorney General's] investigation, regardless of whether that investigation has yet to indicate [any] . . . wrongdoing." Securities & Exch. Comm'n vs. Lines Overseas Mgt., Ltd., U.S. Dist. Ct., No. Civ.A. 04-302 RWR/AK (D.D.C. Jan. 7, 2005). Cf. Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 141-142 (2d Cir. 2014) (personal jurisdiction in nonparty discovery dispute "focus[es] on the connection

between the nonparty's contacts with the forum and the discovery order at issue"); Matter of an Application to Enforce Admin. Subpoenas Duces Tecum of the Secs. Exch. Comm'n v. Knowles, 87 F.3d 413, 418 (10th Cir. 1996) (personal jurisdiction over nonresident in subpoena enforcement action, which was part of investigation into potential violation of Federal securities laws, where "[t]he underlying investigation and th[e] subpoena . . . ar[o]se out of [nonresident's] contacts with the United States").  At this stage, the Attorney General is statutorily authorized to investigate whatever conduct she believes may constitute a violation of G. L. c. 93A.  G. L. c. 93A, § 6 (1). We therefore must construe the C.I.D. broadly, and in connection with what G. L. c. 93A protects.

General Laws c. 93A "is a statute of broad impact" that prohibits "unfair methods of competition" and "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693-694 (1975).  See G. L. c. 93A, § 2 (a).  "Under [G. L. c.] 93A, an act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'" Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593,

596 (1975). The same protection also applies in the commercial context, as G. L. c. 93A extends "to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce." Kraft Power Corp. v. Merrill, 464 Mass. 145, 155 (2013), quoting Manning v. Zuckerman, 388 Mass. 8, 12 (1983). See Kraft Power Corp., supra, citing G. L. c. 93A, § 11 ("The development of the statute . . . suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities").

Our analysis of what constitutes an unfair or deceptive act or practice requires a case-by-case analysis, see Kattar v. Demoulas, 433 Mass. 1, 14 (2000), and is neither dependent on traditional concepts nor limited by preexisting rights or remedies. Travis v. McDonald, 397 Mass. 230, 232 (1986). "This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms 'unfair and deceptive' to grow and change with the times." Nei v. Burley, 388 Mass. 307, 313 (1983).

The Attorney General's investigation concerns climate change caused by manmade greenhouse gas emissions -- a distinctly modern threat that grows more serious with time, and the effects of which are already being felt in Massachusetts. See, e.g., Massachusetts v. Environmental Protection Agency, 549

U.S. 497, 521-523 (2007) (describing current and future harms from climate change affecting Massachusetts). More particularly, the investigation is premised on the Attorney General's belief that Exxon may have misled Massachusetts residents about the impact of fossil fuels on both the Earth's climate and the value of the company, in violation of c. 93A. "Despite [Exxon's] sophisticated internal knowledge" about that impact, the Attorney General states, "it appears that . . . Exxon failed to disclose what it knew to either the consumers who purchased its fossil fuel products or investors who purchased its securities." Because the crux of a failure to disclose theory is knowledge, the C.I.D. seeks "information related to . . . what Exxon knew about (a) how combustion of fossil fuels (its primary product) contributes to climate change and (b) the risk that climate change creates for the value of Exxon's businesses and assets." The C.I.D. also seeks information about "when Exxon learned those facts" and "what Exxon told Massachusetts consumers and investors, among others, about [them]." The primary question for us is whether there is a sufficient connection between those inquiries and Exxon's Massachusetts-based activities.

a.  Long-arm analysis.[3]  Massachusetts's long-arm statute,
G. L. c. 223A, § 3, "sets out a list of specific instances in
which a Massachusetts court may acquire personal jurisdiction
over a nonresident defendant."  Tatro, 416 Mass. at 767.  "A
plaintiff has the burden of establishing facts to show that the
ground relied on under § 3 is present."  Id.  In the Superior
Court, the Attorney General invoked the "transacting any
business" clause of § 3, so we focus our inquiry on that
subsection.  See G. L. c. 223A, § 3 (a) ("[a] court may exercise
personal jurisdiction over a person . . . as to a cause of
action in law or equity arising from the person's . . .
transacting any business in this commonwealth").  "For
jurisdiction to exist under § 3 (a), the facts must satisfy two
requirements -- the defendant must have transacted business in
Massachusetts, and the plaintiff's claim must have arisen from

---

[3] The parties' arguments on the jurisdictional issues focus
exclusively on the due process question, forgoing any analysis
under Massachusetts's long-arm statute, G. L. c. 223A, § 3.  We
recently clarified, however, that Massachusetts courts cannot
"streamline" the personal jurisdiction inquiry by focusing
solely on due process considerations, under the theory that the
limits imposed by the long-arm statute and due process are
coextensive.  See SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324,
329-330 & n.9 (2017).  They are not.  Id.  "The long-arm statute
'asserts jurisdiction over [a nonresident] to the constitutional
limit only when some basis for jurisdiction enumerated in the
statute has been established."  Id. at 329, quoting Good Hope
Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 6 (1979).  We
analyze the long-arm statute's requirement first "in order to
avoid unnecessary consideration of constitutional questions."
SCVNGR, Inc., supra at 325.

the transaction of business by the defendant." Tatro, supra at 767. We construe these dual requirements "broadly," id. at 771, and conclude that they are satisfied here.

In Massachusetts, Exxon operates a franchise network of more than 300 retail service stations under the Exxon and Mobil brands that sell gasoline and other fossil fuel products to Massachusetts consumers. The Attorney General contends that this network establishes an independent basis for personal jurisdiction over Exxon in this matter.[4] The franchise system is governed by a Brand Fee Agreement (BFA). Under section 7 of the BFA, the "BFA Holder" pays Exxon a monthly fee for the use of Exxon's trademarks and to participate in Exxon's business services and programs at the BFA Holder's gasoline stations. Under section 5 of the BFA, Exxon prescribes a method for converting unbranded fuel to Exxon- and Mobil-branded gasoline by injecting certain fuel additives; these additives are to be obtained exclusively from suppliers identified by Exxon, and are inserted according to Exxon's specifications. Under section 7(a)(ii) of the BFA, the dollar amount of a BFA Holder's monthly fee is determined in part by the total amount of Exxon- and

---

[4] The Attorney General also cites additional Massachusetts contacts besides Exxon's franchise network as grounds for our exercise of personal jurisdiction over Exxon. We address those contacts in our discussion of due process, given our conclusion that the "literal requirements of the [long-arm] statute are satisfied" through Exxon's franchise system. Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994).

Mobil-branded fuel sold at the BFA Holder's stations. Specifically, the monthly fee for the final five years of BFA shall equal the amount agreed to between the parties or an amount determined by "Recalculated Total Volume," which is the function of "the total volume of [Exxon- and Mobil-branded fuel] sold in the aggregate by all Direct Served Outlets" during a given period.

The sample BFA submitted to the Superior Court was struck between Exxon and a Massachusetts-based limited liability company; it states that it shall be in effect for a period of fifteen years, with possible extensions, and governs the operation of over 300 Exxon- and Mobil-branded "retail motor fuel outlets" located throughout the State. This network represents Exxon's "purposeful and successful solicitation of business from residents of the Commonwealth," Tatro, 416 Mass. at 767, such that it satisfies the "transacting any business" prong of § 3 (a).

The more difficult question is whether the C.I.D. "aris[es] from" this network of Exxon- or Mobil-branded fuel stations. G. L. c. 223A, § 3 (a). Exxon argues that it does not, because while the Attorney General's investigation is concerned primarily with Exxon's marketing and advertising of its fossil fuel products to Massachusetts consumers, Exxon does not control its franchisees' advertising, and hence those communications

cannot be attributed to Exxon for purposes of personal jurisdiction. The judge determined that Exxon's assertion of a lack of control over franchisees' advertising conflicts with the terms of the BFA. We agree. Section 15(a) requires the BFA Holder and "its Franchise Dealers to diligently promote the sale of [Exxon- or Mobil-branded fuel], including through advertisements," and states that "Exxon[] shall have the authority to review and approve, in its sole discretion, all forms of advertising and sales promotions . . . for the promotion and sale of any product, merchandise or services" that "(i) uses or incorporates any [Exxon trademark] or (ii) relates to any Business operated at a BFA Holder Branded Outlet." This section also obligates the BFA Holder to "expressly require all Franchise Dealers to . . . agree to such review and control by Exxon[]."[5]

In Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 617 (2013), we applied the "right to control" test to the franchisor-franchisee relationship, holding that "a franchisor

---

[5] Exxon says that it proffered evidence below that "BFA holders control their own marketing," citing to certain provisions of the BFA and to an affidavit from Exxon's United States Branded Wholesale Manager, Geoffrey Doescher. The cited-to provisions of the BFA (sections 2[e][6] and 3[a], [h]) address the establishment of the franchise relationship and the use of Exxon's trademarks, and do not clarify control over advertising. Similarly, while the Doescher affidavit states in conclusory fashion that Exxon does not control the "marketing of" or "advertisements by BFA-holders," this is belied by section 15(a) of the BFA.

is vicariously liable for the conduct of its franchisee only where the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff." This test is a useful measure for determining when the conduct of a franchisee may be properly attributed to a franchisor, and we believe that it is equally well suited to our analysis of personal jurisdiction in this case. By virtue of section 15(a) of the BFA, Exxon has the right to control the advertising of its fossil fuel products to Massachusetts consumers.[6]

This leads to our conclusion that the C.I.D. "aris[es] from" the BFA and Exxon's network of branded fuel stations in Massachusetts. G. L. c. 223A, § 3 (a). Through its control over franchisee advertising, Exxon communicates directly with Massachusetts consumers about its fossil fuel products (and hence we reject Exxon's assertion that it "has no direct contact with any consumers in Massachusetts"). This control comports with one of Exxon's "primary business purpose[s]" as expressed

---

[6] We are not persuaded by Exxon's argument that its control over franchisee advertising is solely to protect its trademarks under Federal law. See Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 615 (2013) ("Under Federal law, a franchisor is required to maintain control and supervision over a franchisee's use of its mark, or else the franchisor will be deemed to have abandoned its mark under the abandonment provisions of the Lanham Act"). Section 15(a) expressly states that Exxon's exclusive authority to review and approve such advertising extends not only to advertisements that incorporate Exxon's trademarks, but also, more broadly, to advertising that "relates to any Business operated at a BFA Holder Branded Outlet" (emphasis added).

in section 13(a) of the BFA: "to optimize effective and efficient . . . representation of [Exxon- and Mobil-branded fuel] through planned market and image development." The C.I.D. seeks information about the nature and extent of Exxon's Massachusetts advertisements, including those disseminated through Exxon's franchisees.

More broadly, the C.I.D. seeks information concerning Exxon's internal knowledge about climate change. Many of the requests in the C.I.D. seek documents to substantiate public statements made by Exxon in recent years on the topic of climate change. Exxon protests that its franchisees have nothing to do with climate change and have played no part in disseminating those statements, so the Attorney General's requests cannot "arise from" Exxon's franchise system. Bearing in mind the basis for the C.I.D. and the Attorney General's investigation, G. L. c. 93A, we disagree.

The statute authorizes the Attorney General to initiate an investigation "whenever [s]he believes a person has engaged in or is engaging in" a violation of G. L. c. 93A, in order "to ascertain whether in fact [that] person" is doing so. G. L. c. 93A, § 6 (1). A person may violate G. L. c. 93A through false or misleading advertising. "Our cases . . . establish that advertising need not be totally false in order to be deemed deceptive in the context of G. L. c. 93A. . . . The criticized

advertising may consist of a half-truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information." Aspinall v. Philip Morris Cos., 442 Mass. 381, 394-395 (2004).[7] In order to determine whether Exxon engaged in deceptive advertising at its franchisee stations, by either giving a misleading impression or failing to disclose material information about climate change, the Attorney General must first ascertain what Exxon knew about that topic.

b.  Due process.  We must also determine whether the exercise of personal jurisdiction over Exxon comports with the requirements of due process.  The "touchstone" of this inquiry remains "whether the defendant purposefully established 'minimum contacts' in the forum state."  Tatro, 416 Mass. at 772, quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985).  "The due process analysis entails three requirements.  First, minimum contacts must arise from some act by which the defendant purposefully avails itself of the privilege of conducting

---

[7] See 940 Code Mass. Regs. § 3.02(2) (2014) ("No statement or illustration shall be used in any advertisement . . . which may . . . misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another"); 940 Code Mass. Regs. § 3.05(1)-(2) (1993) ("No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect").

activities within the forum State, thus invoking the benefits and protections of its laws. . . . Second, the claim must arise out of or relate to the defendant's contacts with the forum. . . . Third, the assertion of jurisdiction over the defendant must not offend traditional notions of fair play and substantial justice" (citations and quotations omitted).  Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 457 Mass. 210, 217 (2010).[8]

---

[8] Following the Superior Court judge's decision and the parties' submission of their appellate briefs, the United States Supreme Court decided Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco County, 137 S. Ct. 1773 (2017) (Bristol-Myers), which addresses the exercise of specific personal jurisdiction.  Exxon argues that Bristol-Myers controls our decision, but we are not persuaded.  Bristol-Myers concerned whether the California Supreme Court properly exercised personal jurisdiction over the claims of nonresident plaintiffs, despite the lack of any identifiable connection between those plaintiffs' claims and the nonresident defendant's activities in California.  Id. at 1778.  In concluding that there was personal jurisdiction over the nonresident plaintiffs' claims, the California Supreme Court applied a "sliding scale approach," under which "the strength of the requisite connection between the forum and the specific claims at issue is relaxed if the defendant has extensive forum contacts that are unrelated to those claims."  Id. at 1781.  The Supreme Court reversed, criticizing the "sliding scale approach" and reiterating the need for "a connection between the forum and the specific claims at issue."  Id.  Unlike in Bristol-Myers, the Attorney General's investigation is brought on behalf of Massachusetts residents, for potential violations occurring within Massachusetts.  Moreover, our conclusion that there is personal jurisdiction over Exxon here rests not on Exxon's general Massachusetts-based activities, but on the nexus between certain of Exxon's Massachusetts-based activities and the Attorney General's investigation.

First, Exxon has purposefully availed itself of the privilege of conducting business activities in Massachusetts, with both consumers and other businesses.  As mentioned, Exxon is the franchisor of over 300 Exxon- and Mobil-branded service stations located throughout Massachusetts, and through that arrangement Exxon controls the marketing of its products to Massachusetts consumers.  In addition, Exxon admits that it created Massachusetts-specific advertisements for its products in print and radio.  Such "advertising in the forum State," especially when coupled with its extensive franchise network, is indicative of Exxon's "intent or purpose to serve the market in the forum State."  Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 112 (1987).  See Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 114 (D. Mass. 2003) (purposeful availment where defendant "had advertisements in publications that circulated in Massachusetts" and "purposefully derived economic benefits from its forum-[S]tate activities"); Gunner v. Elmwood Dodge, Inc., 24 Mass. App. Ct. 96, 99-101 (1987) (out-of-State company's advertisements "aimed squarely at Massachusetts targets," which were directed "at establishing ongoing relationships with Massachusetts consumers," supported jurisdiction).  Exxon also operates a Web site that is accessible in Massachusetts and enables visitors to locate the nearest Exxon- and Mobil-branded

service station or retailer.  See Hilsinger Co. v. FBW Invs., 109 F. Supp. 3d 409, 428-429 (D. Mass. 2015) (purposeful availment where nonresident defendant's Web site enabled visitors to contact company to learn where they can buy its products); Bulldog Investors Gen. Partnership, 457 Mass. at 217 (solicitation sent to Massachusetts resident, coupled with Web site accessible in Massachusetts, made it "reasonable for the [nonresident] to anticipate being held responsible in Massachusetts").

Further, Exxon's franchise system in Massachusetts is governed by a contract, the BFA.  While such a contractual relationship is not necessarily a "contact," Burger King Corp., 471 U.S. at 478, when that relationship "reach[es] out beyond one [S]tate and create[s] continuing relationships and obligations with citizens of another [S]tate," the nonresident subjects itself to that other State's jurisdiction for claims related to the contract.  Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n, 339 U.S. 643, 647 (1950).  See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 38 (1st Cir. 2016) (purposeful availment where, among other things, defendant received monthly payments from plaintiff's Massachusetts headquarters).  Under the BFA, the BFA Holder pays Exxon a monthly fee in exchange for the use of Exxon's trademarks, as well as various Exxon business services and

programs, including training and uniforms; Exxon also assists the BFA Holder in procuring the additives necessary to create and sell Exxon- and Mobil-branded fuel.  Through this agreement Exxon has "deliberately targeted the Massachusetts economy and reasonably should have foreseen that, if a controversy developed, it might be haled into a Massachusetts court." Baskin-Robbins Franchising LLC, supra at 39.

The Attorney General's investigation "arise[s] out of, or relate[s] to" these contacts.  Tatro, 416 Mass. at 772.  As mentioned, the Attorney General is authorized to investigate potential violations of G. L. c. 93A.  G. L. c. 93A, § 6.  In addition to prohibiting deceptive advertising to consumers, Aspinall, 442 Mass. at 395, c. 93A also requires honest disclosures in transactions between businesses.  See Kraft Power Corp., 464 Mass. at 155; G. L. c. 93A, § 11.  "A duty exists under c. 93A to disclose material facts known to a party at the time of a transaction."  Underwood v. Risman, 414 Mass. 96, 99-100 (1993).  The C.I.D. seeks information relating to Exxon's knowledge of "the risk that climate change creates for the value of [its] businesses and assets," and "what Exxon told Massachusetts consumers and investors, among others, about those facts."  Possible misrepresentations or omissions about the threat that climate change poses to Exxon's business model are highly relevant to its contracts with BFA Holders, who agree,

under section 1 of the BFA, to fifteen-year terms with Exxon and who are required, under section 21(b), to indemnify Exxon against all claims and liabilities based on State consumer protection and environmental laws, among others.

The exercise of personal jurisdiction over Exxon also does not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940). See Burger King Corp., 471 U.S. at 477 (where court has determined nonresident has requisite minimum contacts, party must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable"). Exxon has produced no evidence that responding to the Attorney General's investigation would be unreasonable. Even assuming that it had, we would balance that showing with "the Commonwealth's interest in enforcing its laws in a Massachusetts forum." Bulldog Investors Gen. Partnership, 457 Mass. at 218. As Massachusetts's chief law enforcement officer, the Attorney General has a manifest interest in enforcing G. L. c. 93A. See, e.g., G. L. c. 93A, § 6 (Attorney General may investigate "whenever [s]he believes" c. 93A violation has occurred); id. at § 4 (Attorney General may file civil actions "in the name of the commonwealth"); id. at § 5 (Attorney General may seek assurances of discontinuance of unlawful acts or practices); id. at § 2 (c)

(Attorney General "may make rules and regulations interpreting" what constitutes unlawful act or practice).[9]

2. Exxon's challenge to the substance of the C.I.D. Exxon also challenges the C.I.D. based on its content, arguing that it is "overbroad and unduly burdensome," as well as "arbitrary and capricious." Exxon argues that these points constitute "good cause" warranting our modifying or setting aside the C.I.D. under G. L. c. 93A, § 6 (7) ("the court may, upon motion for good cause shown . . . modify or set aside such demand or grant a protective order"). As "[t]he party moving to set aside [the] C.I.D.[, Exxon] bears a heavy burden to show good cause why it should not be compelled to respond." CUNA Mut. Ins. Soc'y v. Attorney Gen., 380 Mass. 539, 544 (1980). See Attorney Gen. v. Bodimetric Profiles, 404 Mass. 152, 155 (1989). The judge concluded that Exxon had failed to sustain that burden, and we review her conclusion for an abuse of discretion. Matter of a

_____

[9] Because we conclude that due process is satisfied by virtue of the nexus between the Attorney General's investigation and Exxon's franchise system, we need not reach the parties' arguments with respect to the Attorney General's alternative theory that Exxon may have deceived investors with respect to climate change. Although the cover letter of the C.I.D. states that the investigation concerns potential violations of G. L. c. 93A with respect to both consumers and investors, very few of the C.I.D.'s requests even mention investors or securities, and even then, those requests likewise concern Exxon's internal knowledge and discussions concerning climate change (in these requests, for the purpose of preparing securities filings or investor communications). Given the focus on Exxon's knowledge, these requests also relate sufficiently to the Attorney General's consumer deception theory.

Civil Investigative Demand Addressed to Yankee Milk, Inc., 372 Mass. 353, 356 (1977) (Yankee Milk) ("in C.I.D. matters there must be, as in all discovery proceedings, a broad area of discretion residing in the judge").

By its terms, G. L. c. 93A, § 6, authorizes the Attorney General to initiate an investigation "whenever [s]he believes a person has engaged in or is engaging in any method, act or practice declared to be unlawful by this chapter." This grants the Attorney General "broad investigatory powers." Bodimetric Profiles, 404 Mass. at 157. See Yankee Milk, 372 Mass. at 364 ("the Legislature [particularly in providing that the interrogated party must show 'good cause' why demands should not be honored] has indicated that the statute should be construed liberally in favor of the government"). Still, the statute imposes certain limitations on the scope of the Attorney General's investigative authority that we must consider.

In pertinent part, § 6 (1) (b) authorizes the Attorney General to "examine . . . any documentary material . . . relevant to such alleged unlawful method, act or practice" that is the subject of the Attorney General's investigation. This "sets forth a relevance test to define the documents the Attorney General may examine." Yankee Milk, 372 Mass. at 357. See Bodimetric Profiles, 404 Mass. at 156. Her power to examine such documents is further constrained by § 6 (5), in particular

its provision prohibiting a C.I.D. from "contain[ing] any requirement [that] would be unreasonable or improper if contained in a subpoena duces tecum issued by a court of the [C]ommonwealth."  We have interpreted this particular provision to impose a "three-pronged test" intended to "balance the opposing interests of the investigator and the investigated." Yankee Milk, supra at 361 n.8.  Here, a court must consider (1) whether the C.I.D. "describe[s] with reasonable particularity the material required,"[10] (2) whether "the material required is not plainly irrelevant to the authorized investigation,"[11] and (3) whether "the quantum of material required does not exceed reasonable limits."  Id. at 360-361.  See Matter of a Civil Investigative Demand Addressed to Bob Brest Buick, Inc., 5 Mass. App. Ct. 717, 719-720 (1977) ("It cannot now be said that the C.I.D., as modified, was too indefinite, exceeded reasonable limits, or was plainly irrelevant . . . to the public interest sought to be protected" [citations and quotations omitted]).

---

[10] This factor mirrors the particularity requirement of the previous section, G. L. c. 93A, § 6 (4) (c), which mandates that the notice of a C.I.D. "describe the class or classes of documentary material to be produced thereunder with reasonable specificity, so as fairly to indicate the material demanded." See Yankee Milk, 372 Mass. at 361 (observing that these two provisions "impose[] . . . an equivalent [specificity] standard").

[11] Similarly, the relevance requirement of this second factor mirrors the relevance requirement of § 6 (1) (b), and we interpret the two to impose an identical standard.

"Violation of one of these standards [under § 6 (5)] constitutes 'good cause' allowing the court to modify or set aside a demand" pursuant to § 6 (7).  Yankee Milk, supra at 359 n.7.  See Harmon Law Offices, P.C. v. Attorney Gen., 83 Mass. App. Ct. 830, 834-835 (2013) ("Good cause is shown only if the moving party demonstrates that the Attorney General acted arbitrarily or capriciously or that the information sought is plainly irrelevant").  With these limitations in mind, we turn to the judge's conclusion that Exxon had not met its burden of showing "why it should not be compelled to respond" to the C.I.D.  CUNA Mut. Ins. Soc'y, 380 Mass. at 544.

First, we agree with the judge that the C.I.D. describes with reasonable particularity the material requested, G. L. c. 93A, § 6 (4) (c), (5), given its focus on Exxon's knowledge of the impacts of carbon dioxide and other fossil fuel emissions on the Earth's climate.  With respect to the relevance of the materials sought, Exxon argues that the Attorney General's request for historic documents dating as far back as 1976 are not relevant to an investigation under c. 93A, which carries a four-year statute of limitations.  G. L. c. 260, § 5A.  We find no support for Exxon's position, either in law (Exxon fails to cite any case) or logic.  A document created more than four years ago is, of course, still probative of Exxon's present knowledge on the issue of climate change, and whether Exxon

disclosed that knowledge to the public.  Because these materials are not "plainly irrelevant," Yankee Milk, 372 Mass. at 360, the requests are permissible under this factor.

We are also not persuaded that the C.I.D.'s requests "exceed reasonable limits."  Id. at 361.  Documentary demands do so "only when they 'seriously interfere with the functioning of the investigated party by placing excessive burdens on manpower or requiring removal of critical records.'"  Bodimetric Profiles, 404 Mass. at 159, quoting Yankee Milk, supra at 361 n.8.  In analyzing this point, the judge properly considered the fact that Exxon has already complied with a request for similar documents from New York's Attorney General.  The judge reasonably inferred that it would not be too burdensome for Exxon, having already complied with that request, to comply with the Massachusetts C.I.D., which is similar in nature.[12]  Exxon does not cite to the record before us to support a contrary conclusion.  Further, we have recognized that in cases such as this, where "the requested information is . . . peculiarly within the province of the person to whom the C.I.D. is addressed, broad discovery demands may be permitted even when

---

[12] The judge wrote:  "At the hearing, both parties indicated that Exxon has already complied with its obligations regarding a similar demand for documents from the New York Attorney General. In fact, as of December 5, 2016, Exxon had produced 1.4 million pages of documents responsive to the New York Attorney General's request."

such a demand 'imposes considerable expense and burden on the investigated party.'" Bodimetric Profiles, supra.

The remainder of Exxon's challenge to the substance of the C.I.D. concerns its assertion that the Attorney General issued the C.I.D. solely as a pretext, "rendering the [C.I.D.] an arbitrary and capricious exercise of executive power." Exxon cites to cases from other contexts to suggest that our analysis of the propriety of the C.I.D. must include an evaluation of the reasonableness of the Attorney General's reasons for issuing it. "There is no requirement that the Attorney General have probable cause to believe that a violation of . . . c. 93A has occurred. [She] need only have a belief that a person has engaged in or is engaging in conduct declared by be unlawful by . . . c. 93A. In these circumstances, the Attorney General must not act arbitrarily or in excess of [her] statutory authority, but [s]he need not be confident in the probable result of [her] investigation." CUNA Mut. Ins. Soc'y, 380 Mass. at 542 n.5. The judge determined that the Attorney General has "assayed sufficient grounds -- her concerns about Exxon's possible misrepresentations to Massachusetts consumers -- upon which to issue the [C.I.D]." The Attorney General's belief that Exxon's conduct may violate c. 93A is all that is required under G. L. c. 93A, § 6 (1).

3.  Disqualification of the Attorney General.  Exxon also seeks the disqualification of the entire office of the Attorney General from this investigation.  Exxon bases its request on comments made by the Attorney General in March, 2016, at the press conference where she announced the commencement of her investigation into Exxon.  The judge denied Exxon's request, and we review the denial for an abuse of discretion.  Commonwealth v. Reynolds, 16 Mass. App. Ct. 662, 664 (1983).

At the press conference, titled "AGs United for Clean Power," the Attorney General spoke about the basis for her investigation.  The relevant portion of her comments were as follows:

> "Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts.  Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable.  That's why I, too, have joined in investigating the practices of Exxon . . . . We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public."

Exxon argues that these comments violated Mass. R. Prof. C. 3.6, as appearing in 471 Mass. 1430 (2015), which prohibits any lawyer from making prejudicial statements to the public concerning an ongoing investigation.  Where a violation has occurred, a judge may disqualify the violator.  See Pisa v.

Commonwealth, 378 Mass. 724, 728-730 (1979). The judge concluded that the Attorney General's comments contained no "actionable bias," and instead were intended only to inform the public of the basis for the investigation into Exxon. We discern no abuse of discretion in the judge's conclusion. The Attorney General is authorized to investigate what she believes to be violations of c. 93A. G. L. c. 93A, § 6 (1). As an elected official, it is reasonable that she routinely informs her constituents of the nature of her investigations. See Buckley v. Fitzsimmons, 509 U.S. 259, 278 (1993) (statements to press by prosecutor serve vital public function); Commonwealth v. Ellis, 429 Mass. 362, 372-373, 378 (1999) (discussing prosecutor's duty to zealously advocate within ethical limits).

4. Exxon's request for a stay. The day before filing its request to modify or set aside the C.I.D., Exxon filed a complaint for declaratory and injunctive relief in the United States District Court for the Northern District of Texas challenging the C.I.D. on constitutional grounds not raised in this action.[13] Exxon requested that the Superior Court judge

---

[13] The Federal action was transferred to the United States District Court for the Southern District of New York, and on March 29, 2018, the District Court dismissed Exxon's complaint with prejudice due to Exxon's failure to state a claim and the preclusive effect of the Superior Court decision in this matter. See Exxon Mobil Corp. vs. Healey & another, U.S. Dist. Ct., No. 1:17-cv-02301 (S.D.N.Y. Mar. 29, 2017). Because Exxon may

stay this matter pending the resolution of the Federal suit. The judge denied Exxon's request, and we review that denial for an abuse of discretion. Soe v. Sex Offender Registry Bd., 466 Mass. 381, 392 (2013).

In denying Exxon's request, the judge reasoned that the Superior Court is better equipped than a Federal court in Texas to decide a matter pertaining to Massachusetts's primary consumer protection law, G. L. c. 93A.[14] Exxon argues that this constitutes an abuse of discretion, and contends, somewhat remarkably, that there "is good reason to question the premise" that Massachusetts courts are more capable than out-of-State courts to oversee cases arising under c. 93A. The Legislature designated the Superior Court as the forum for bringing a challenge to a C.I.D. issued under G. L. c. 93A, § 6. See G. L. c. 93A, § 6 (7) ("[t]he motion may be filed in the superior court of the county in which the person served resides or has his usual place of business, or in Suffolk county"). Likewise, the Legislature provided that civil actions under G. L. c. 93A, § 9 or 11, may be brought in the Superior Court, the Housing

___

appeal from the Federal decision, we do not treat as moot Exxon's request to stay the Massachusetts proceedings.

[14] The judge also determined that "the interests of substantial justice dictate that the matter be heard in Massachusetts," citing G. L. c. 223A, § 5. Exxon has not argued that it would be unfairly prejudiced by having to litigate in Massachusetts, and thus has not moved to dismiss under the doctrine of forum non conveniens.

Court, or the District Court, see G. L. c. 93A, §§ 9 (1), (3A), 11, with the Superior Court retaining the broadest grant of jurisdiction over c. 93A claims.[15]  It should go without saying that Massachusetts courts, which routinely hear c. 93A claims, are better equipped than other courts in other jurisdictions to oversee such cases.

Exxon's contention that the lower court erred in failing to apply the "first-filed" rule is equally unavailing.  The filing of a complaint in Federal court one day before a State court filing hardly triggers a mechanical application of the first-filed rule.  See, e.g., EMC Corp. v. Parallel Iron, LLC, 914 F. Supp. 2d 125, 127 (D. Mass. 2012) ("Exceptions to the [first-filed] rule are not rare. . . .  [A court] has discretion to give preference to a later-filed action when that action will better serve the interests involved"); Bacardi Int'l Ltd. v. V. Suarez & Co., 719 F.3d 1, 15 (1st Cir.), cert. denied, 134 S. Ct. 640 (2013) (discouragement of forum-shopping is consideration when ruling on motion to stay).

---

[15] Whereas the Housing Court's jurisdiction over c. 93A claims is restricted to those involving housing matters, see G. L. c. 93A, § 9 (1); G. L. c. 185C, § 3, and the District Court has jurisdiction over actions "for money damages only," G. L. c. 93A, §§ 9 (3A), 11, the Superior Court is not so limited, and may hear any case under c. 93A "for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."  G. L. c. 93A, § 9 (1).

Finally, where there is only a partial overlap in the subject matter of two actions, a judge has considerable discretion when deciding whether to grant a stay. See In re Telebrands Corp., 824 F.3d 982, 984 (Fed. Cir. 2016); TPM Holdings, Inc. v. Intra-Gold Indus., Inc., 91 F.3d 1, 4 (1st Cir. 1996) ("where the overlap between two suits is less than complete, the judgment is made case by case"). Exxon acknowledges that the Federal action "challenges the investigation on constitutional grounds not raised in this action" (emphasis added).[16] The judge did not abuse her discretion in denying the stay. Compare Provanzano v. Parker, 796 F. Supp. 2d 247, 257 (D. Mass. 2011) (declining to stay because first-filed action was in anticipation of lawsuit in question, claims in cases were not identical, current action had proceeded further in court, and case involved application of Massachusetts statute).

5. Conclusion. We affirm the order denying Exxon's motion to modify or set aside the C.I.D., Exxon's request to disqualify the Attorney General, and Exxon's motion to stay these proceedings. We further affirm the order granting the Attorney

---

[16] Exxon's Federal complaint for declaratory and injunctive relief is based on violations of Exxon's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as an alleged violation of the dormant commerce clause and an abuse of process claim.

General's cross motion to compel Exxon's compliance with the
C.I.D.

<u>Judgment affirmed</u>.