# United States Court of Appeals
## For the First Circuit

No. 19-2001

ANOUSH CAB, INC.; ARAMS, INC.; ARARRAT, INC.; ATLANTIC CAB, INC.; BARLOW CAB, INC.; BEDROS CAB, INC.; BOYLSTON CAB, INC.; BRIGHAM CAB, INC.; CLEVELAND CAB, INC.; DIAMOND CAB, INC.; ELSIE CAB, INC.; FENWAY TAXI,INC.; G&A CAB, INC.; JORDAN CAB, INC.; JUBRAN CAB, INC.; KILMARNOCK CAB,INC.; LITTLE ISLAND CAB, INC.; LOCUST CAB, INC.; LONGWOOD CAB, INC.; M & AN CAB, INC.; M.P.E. CAB, INC.; MARBED CAB, INC.; MASSIS, INC.; MESROB, INC.; N.E. CAB, INC.; ORIOLE CAB, INC.; PETERBOROUGH CAB, INC.; QUEENSBURY CAB,INC.; SAHAG, INC.; SOVEREIGN CAB, INC.; V & A CAB, INC.; VERAS, INC.; VICKYS, INC.; YELLOWBIRD CAB, INC.,

Plaintiffs, Appellants,

GILL & GILL, INC.; NANAK NAAM, INC.; AMRITSAR EXPRESS, INC.; SONNY AND BOBBY TRANS., INC.; GILL TRANS., INC.; FINOS TAXI, INC.; CHARLENE TAXI, INC.; MYTASHA TAXI, INC.; WYOMING CAB, INC.; EDWARD'S TAXI, INC.; CURTIS CAB, INC.; MY FATHER TAXI, INC.; MIC-PAUL TAXI, INC.; A. STACY TAXI, INC.; PATTI PIE TAXI, INC.; MCGAFF TAXI, INC.; RAWAN TAXI, INC.; SPRING TAXI, INC.; SUMMERS TAXI, INC.; AUTUMN TAXI, INC.; WINTERS TAXI, INC.; BOW STREET TAXI; BLUE KNIGHT TAXI, INC.; CHELE TAXI, INC.; CHRISTMAS TAXI, INC.; GES TAXI, INC.; GRAND SPORT TAXI, INC.; BREENIE TAXI, INC.; LIL'S TAXI, INC.; CLAIRE TAXI, INC.; DON-LIL TAXI, INC.; ANDY'S CAB, INC.; BOARDMAN CAB, INC.; GROVE CAB, INC.; SECRET SQUIRREL TAXI, INC.; NAVJIT CAB, INC.; PREED, INC.; NAJJAR ENTERPRISES, INC.; BILGA, INC.; JIMMY 1, INC.; ANJU TRANS., INC.; DEEP CAB, INC.; EMATESSE CAB, INC.; CHRISTOPHER CAB, INC.; DADOO CAB, INC.; GURU GOBIND CAB, INC.; AUBANEL TRANS., INC.; RAMC CAB, INC.; TED D. J. TAXI, INC.; MAKONNEN CAB, INC.; YELLOW CAB OF BELMONT, INC.; MAJID, INC.; JOUNE, INC.; HARE HARE TRANS., INC.; ANPAUL CAB, INC.; TABIKING EXPRESS, INC.; MARCIA AND EVERTON CAB, INC.; RICARDO & JOANNE CAB, INC.; PATIENCE TAXI, INC.; TURK TRANS., INC.; NATIVITY CAB, INC.; ROSE CAB, INC.; HAAMA TRANS, INC.; TOM'S TAXI, INC.; MERA SOAMI, INC.; MUGAL TRANS., INC.; KHAVEERI, INC.; F. EDEL, INC.; ANGEREB, INC.; TREMONT STREET TAXI, INC.; GANGA, INC.; NEW INVISION, INC.; K. HEYDEN, INC.; BRENT TAXI, INC.; IRAJ, INC.; SWAMI JI, INC.; GEOLANGE, INC.; ESPERANTA TAXI, INC.; SINGH CAB, INC.; SHIVA JI CAB, INC.; LARROUSE CAB, INC.; JAVE CAB, INC.;

TALIN CAB, INC.; LUNICA, INC.; NILE EXPRESS, INC.; SMOOTH RIDER, INC.; E. AND ANNE TAXI, INC.; ALEN'S CAB, INC.; MEGAN CAB, INC.; SAMUEL TRANSPORTATION, INC.; PETIT GOAVE CAB, INC.; MICHAEL CAB, INC.; ABSOLUTE TAXI OF CAMBRIDGE, INC.; ALTA TAXI, INC.; TARJAN CAB, INC.; ALEXANDRIA TRANS., INC.; KOHSAR, INC.; RIVAL CAB, INC.; YHWH SABAOTH, INC.; PRAISE THE LORD, INC.; HARVARD SQUARE CAB, INC.; FLYING CARPET CAB, INC.; MEHROSE, INC.; AMAR TRANS., INC.; RB CAB, INC.; CROYANCE CAB, INC.; P.I. CAB, INC.; HOMANO & CARL TAXI, INC.; FLEDO, INC.; J.W. CAB INC.; PIDI CAB, INC.; GODAVARI, INC.; ST. RICHARD TAXI, INC.; RUTH CAB, INC.; SATKARTAR, INC.; ELIOT CAB, INC.; WADH BAGH SINGH CAB, INC.; MY YASMINA CAB, INC.; TWO GIRLS TAXI, INC.; PAPESO CAB, INC.; ZAHIDA TRANS., INC.; YVES TAXI, INC.; YUNG CAB, INC.; PALOMA TRANSPORTATION, INC.; MARTHA'S TRANS., INC.; LA BOULE DE FEU, INC.; SPLENDIDE CAB, INC.; SHOOPITE CAB, INC.; GREEN LAND, INC.; TR CAB, INC.; FEDSEN & TEDSEN, INC.; DIEU EST BON, INC.; VICEROY CAB, INC.; NEGES JR., CAB, INC.; RADHA SWAMI BIAS, INC.; PROMISE CAB, INC.; G.G.M. CAB, INC.; PABLE TAXI, INC.; BROTHERS CAB, INC.; KASSIE CAB, INC.; JAZZ TAXI, INC.; B GOOD CAB, INC.; OHM, SHIVA & GANESH CAB, INC.; L'OISEAU TAXI, INC.; LYSETTE & JARDUS, INC.; FATIMA CAB, INC.; SELON DIEU CAB, INC.; M. & D. BROTHERS, INC.; LA TRINITE, INC.; LOVELY ONE, INC.; WILVENS CAB, INC.; GOOD TIME CAB, INC.; DOU DOU CAB, INC.; MGP TAXI, INC.; G. JOSE CAB, INC.; JEAHANNA TAXI, INC.; NATOU CAB, INC.; CLERNA CORP.; ANTONIO & FRANCO, INC.; GURU TEGH BHADUR CAB, INC.; MONA CAB, INC.; ERIC & MARIA CAB, INC.; CHRIS AND JUNIOR, INC.; SURPRISE CAB, INC.; CHENAL CAB, INC.; ANH CAB, INC.; AUGUST CAB, INC.; KARTAR CAB, INC.; NIMRAH TRANS., INC.; JELUS CAB, INC.; ELZIRA & LUC CAB, INC.; BKMB, INC.; ONLY BELIEVE TAXI, INC.; NADA, INC.; MANOR CAB, INC.; GALEHAD TAXI, INC.; A. TAMMY CAB, INC.; GARVEN'S CAB, INC.; ARNOLD COURT TAXI, INC.; BBJ CAB, INC.; SILVA CAB, INC.; GUMAT CAB, INC.; BRIOL CAB, INC.; BEST IS BEST CAB, INC.; MJ TAXI CAB, INC.; SAMI'S TAXI, INC.; C.T.P. I, INC.; ERA ET LABORA, INC.; MUNNY TRANS., INC.; HARSH CAB, INC.; SOEG CAB, INC.; ALDINE CAB, INC.; TIVY, INC.; ISAIH MATHEW, INC.; ADVANTAGE TAXI OF CAMBRIDGE, INC.; BANWAIT TRANS., INC.; CAYES II CAB, INC.; JACQUET CAB, INC.; EBEN-EZER TAXI CAB, INC.; YOLY-CARVENS, INC.; SHEIKH TRANS., INC.; MY NATHALIE CAB, INC.; RED FISH CAB, INC.; AZIN TAXI, INC.; MEKLIT CAB, INC.; P & S TAXI CORP.; ROBENSON TAXI, INC.; RP EXCELSIOR, INC.; MILLENNIUM TAXI, INC.; BB TAXI EXPRESS, INC.; TEJA TRANS., INC.; ROL & G., INC.; LOVE CAB, INC.; LES GENS DU NORD, INC., BHARGO INC., H & L CAB, INC.; DELIVRANCE CAB, INC.; TOWN TAXI OF CAPE COD, INC.; KURALA TRANS., INC.; TINA & NINA TRANS., INC.; MAVA TAXI, INC.; CAMBRIDGE CAB CONNECTION, INC.; HERNANDEZ TRANSPORTATION, INC.; RIL-TUL CAB, INC.; KHALSA CAB, INC.; ALPHA OMEGA CAB, INC.; T & J CAB, INC.; MT. EVEREST, INC.; U & I CORP.; JFL CAB, INC.;

DADY-PHONE, INC.; R. CANDY TAXI, INC.; VICTORIA CAB, INC.; SELAM TRANSPORTATION, INC.; PRO-CAB, INC.; YOTILLE CAB, INC.; ABCD TAXI, INC.; NKB CAB, INC.; MARCUS CAB, INC.; ELPOORAG, INC.; KENDRA CORPORATION; BRITNEY CAB, INC.; ELAN CAB, INC.; JAI GURUDEV CORPORATION; DOPHY TAXI, INC.; DREAMERS CAB, INC.; WALGER, INC.; DESDUNES UNITED, INC.; PATRICK TAXI, INC.; DOUCEUR CAB, INC.; JE CROIS EN DIEU, INC.; MT. CARMELLE TAXI, INC.; ABBED CAB, INC.; ADDIS CAB, INC.; ARIEL & JAPHETH, INC.; BETHEL CAB, INC.; CHARLIE CAB, INC.; CORETTA, INC.; CYRILO CAB, INC.; DALESHA TAXI, INC.; DESDUNES CAB, INC.; ELYSSE CORPORATION; FIRST STREET CAB, INC.; G & E. CAB, INC.; GL CAB, INC.; GOH CAB, INC.; GAGAN TAXI, INC.; JACQUELINE CAB, INC.; JEREMIE TAXI, INC.; LOUINE CAB, INC.; M. ANGELO CAB, INC.; NAHAR SINGH CAB, INC.; NEK FAB, INC.; O.D.J. TAXI, INC.; ONKAR CAB, INC.; PH & KN, INC.; RADHA TRANS., INC.; RANDAH CAB, INC.; S & J INC.; TWO BOYS CAB, INC.; VIRGINIA CAB, INC.; WINDSOR CAB, INC.; ZANDO CAB, INC.; AHRAM CAB, INC.; AN YIN PA TA, INC.; ANDERSON & JOSHUA CAB, INC.; ANNA CAB, INC.; ARISTOCRATS AMBIANCE TAXI, INC.; BAINET CAB, INC.; BAY CITY TAXI, INC.; BIBI'S CAB, INC.; C.E.F. CAB, INC.; CAMBRIDGE CLASSIC CAB, INC.; CAYES CAB, INC.; CENTRAL SQUARE, CAB, INC.; CLEO TAXI, INC.; DEMOSTERNE, INC.; EAGLE TAXI, INC.; EL CHALDAY, INC.; ELIZABETH CAB, INC.; ENCHANTE TAXI, INC.; EUREKA CAB, INC.; FARB, INC.; G & J CAB INC.; GIORGIO'S CAB, INC.; GOLDEN TEMPLE TRANS., INC.; GREEN STRIPE CAB, INC.; GURU TRANS., INC.; HAWELTI CAB, INC., HOSANA TAXI, INC., ITA CAB, INC.; IMPECCABLE TRANS, INC.; JMF CAB, INC.; JV TAXI, INC.; JEZIL CAB, INC.; JOYSE CAB, INC.; KARIM CAB, INC.; KESHIA CAB, INC.; KEVIN TAXI, INC.; KRISHANA TRANS., INC.; KRISHNA KRISHNA TRANS., INC.; LARRIEUX CAB, INC.; LELE CAB, INC.; LEXINGTON TAXI, INC.; MIT CAB, INC.; MARK & S, INC.; MAS TAXI, INC.; MELCHISEDEK CAB, INC.; MIRKA, INC.; MOGADISHU CAB, INC.; NAJU, INC.; NELCHERI CAB, INC.; NO NO CAB, INC.; P & G CAB, INC.; P & P DUMERANT CORP.; PAFOU CAB, INC.; PAPU, INC.; PAUL CAB, INC.; QUEEN JESSICA CAB, INC.; RAAVI TRANS., INC.; RAI TRANSPORTATION, INC.; RED CAB OF WORCESTER, INC.; RENEE TAXI, INC.; RENETTE & FRANCKLYN, INC.; RIOS GON CAB, INC.; ROCK SOLID & MOMONE, INC.; ROLY CAB, INC.; SASUN CAB, INC.; SATNUM CAB, INC.; SEA WALL TAXI, INC.; SHANI TAXI, INC.; SUNSET CAB, INC.; SYMPHONY TAXI, INC.; TT, INC.; TAXI TECHNOLOGY, INC.; TAYLOR TAXI, INC.; TELFORT CAB, INC.; ULYSSE TRANS. HOLDING, CORP.; ULYSSE'S CAB, INC.; YO YO CAB, INC.; YOU TOO CAB, INC.; ZICKY CAB, INC.; 116 CAB, INC.; HANEF TRANS., INC.; TRISTAN & VANESSA CAB, INC.; BINYAMIN CAB, INC.; CATHUL, INC.; CHRISTOPHER'S CAB, INC.; DILLONS TRANS., INC.; MARZENEB, INC.; MESHUALEKIA, INC.; PHATRICKSEY CAB, INC.; YOU AND I CAB, INC.; BENITO & ROSELINE CAB, INC.; DE LEREBOURS, INC.; LARACINE, INC.; LEYNA CAB, INC.; MOBARAK CAB, INC.; REHAM CAB, INC.; ROSAMELIA INC.; SJP TAXI,

INC.; THOMAS FAMILY, INC.; GADL CAB, INC., LIDETA CAB, INC.; KBS CAB, INC.; MSW TAXI, INC.; MAHNOOR TRANS., INC.; PAL TAXI, INC.; ROODY'S CAB, INC.; C & G LEASING, INC.; LA DILIGENCE, INC.; HARE KRISHNA TRANS., INC.; JOJO E.M. CAB, INC.; JANE MARY CAB, INC.; JEFFREY & TANISHA, INC.; JEHOVAH JUREH, INC.; KALKAT CAB, INC.; HIRAM'S TAXI, INC.; STEFAN TUROLSKI; DEFER CAB, INC.; SHREE GANESH CAB, INC.; CADOUX TAXI, INC.; DERUKA TAXI, INC.; FAFOU CAB, INC.; M AND J CAB, INC.; N M R CAB, INC.; NOOR CAB, INC.; PAUL PARAS; PUNJAB TRANS., INC.; SWEET ROSE TRANS., INC.; TAJ TRANS., INC.; TAKE IT EZ CAB, INC.; YOUSSEF, INC.; BETRU AMI CORP.; CROSSROAD TRANS. INC.; HATTIE CAB, INC.; HIMALAYA, INC.; IQRA ENTERPRISE, INC.; JASON CAB, INC.; MCG CAB, INC.; MANHAR, INC.; MICASTA CAB, INC.; NEXT CAB, INC.; PARVATI CAB, INC.; RODNEY CAB, INC.; SJ CAB, INC.; SATLOUJ, INC.; SEVEN HILLS TAXI, INC.; TI LOU LOU CAB, INC.; DALUL, INC.; FRANKLIN TAXI, INC.; LES-MAR TAXI, INC.; BERN. & Y. CAB, INC.; DEBRA CAB, INC.; EDWARD NOEL, INC.; GOD IS GOOD, INC.; JUDE CAB, INC.; YAHWEH CAB, INC.; BABA NANAK CAB, INC.; CARLON TRANS., INC.; MATELOTS, INC.; MEW CAB, INC.; NANCY CAB, INC.; ON Y VA TAXI, INC.; BENBEN CAB, INC.; BENO CAB, INC.; C.T.P. II, INC.; D Q DONNE CAB, INC.; KRIPALU TRANS., INC.; NOMA CAB, INC.; OROW, INC.; RADHA SOAMI, INC.; REBECCA CAB, INC.; BARAN TRANS., INC.; CAMBRIDGE TAXI, INC.; J & J TRANSPORTATION, INC.; LE BON BERGER, INC.; NICKY TRANS, INC.; SAMYR CAB, INC.; SOSTHENE, INC.; W.L.E.J., INC.; WILLKY-MEDGENE, INC.; DAPHNE TAXI, INC.; ET CAB, INC.; FERN, INC.; FOUR J'S CAB, INC.; GRAND CANYON, INC.; HARE RAM TRANS., INC.; INMAN CAB, INC.; MITACHAL CAB, INC.; NEL & SON, INC.; P.B. CAB, INC.; RIPERT CAB, INC.; SOUTH SUDAN CORP.; THE 32 SUMMER ST. CORP.; YAMUNA, INC.; ZUBIR, INC.; EMILY & KELLY CAB, INC.; GABRIELLE CAB, INC.; KETTERLE CAB, INC.; LOREN CAB, INC.; TWINS BROTHERS TRANSPORTATION, INC.; VETTE TAXI, INC.; YILMA TRANS., INC.; ALICE'S CAB, INC.; G & V & R CAB, INC.; GEORGE'S CAB, INC.; M & F TRANS, INC.; METAXIA MOTOR, INC.; TUNG'S CAB, INC.; TUTUN CAB, INC.; CAF TAXI, INC.; EMILY'S TAXI, INC.; GCF TAXI, INC.; LEGENDS TRANS, INC.; MATTHEW'S TAXI, INC.; WARSAI, INC.; HEMENWAY TAXI, INC.; IN-TOWN TAXI, INC.; LEANA'S CAB, INC.; MGF TAXI, INC.; MILA CAB, INC.; OMF TAXI, INC.; OLIVIA'S TAXI, INC.; REEL CAB, INC.; YURY TAXI, INC.; BRISTOL CAB, INC.; DORCAR CAB, INC.; ERITREA TRANS, INC.; JESSICA T, INC.; MALVINA TAXI, INC.; WOODSIDE TAXI, INC.; BRENDA TAXI, INC.; CYNTHIA CAB, INC.; FARES CAB, INC.; J&D TAXI, INC.; LUBA CAB, INC.; SHAHIN TAXI, INC.; CARLY CAB, INC.; DEPENDABLE DISPATCH, INC.; NU-CHECKER, INC.; CECILARD TRANSPORTATION, INC.; TARA TRANSPORTATION, INC.; AAA CAB, INC.; ABBAS CAB, INC.; E.D.R. CAB, INC.; CAMBRIDGE TRANSPORTATION SERVICES, INC.; FILLETTE CAB, INC.; SYCOONE TAXI, INC.; TAXI MANAGEMENT, INC.; JEFF & NAYAMA, INC.; MYRA, INC.; SAINT, INC.; STEP BY STEP CAB, INC.; ANGE & MICHELLE, INC.;

ANDREW J. CAB, INC.; ADDIS ABABA, INC.; ALGANES CAB, INC.; MALDEN TRANSPORTATION, INC.; PEGM TRANSPORTATION, LLC; MEDFORD TRANS., INC.; EVERETT CAR SERVICE, INC.; TALKD TRANSP., INC.; ARGON CAB, INC.; CEDAR CAB, INC.; COBALT CAB, INC.; EVERGREEN CAB, INC.; HARVEST CAB, INC.; MONUMENT LEASING, INC.; MYSTIC LEASING, INC.; PEARL CAB, INC.; SAM'S CAB, INC.; TRITON CAB, INC.; UNION CAB, INC.; VEITA CAB, INC.; WEST END LEASING, INC.; GREEN CAB CO., INC.; FLEET LEASING, INC.; GREENWAY LEASING, INC.; HARBOR LEASING, INC.; HARVEST CAB, INC.; GREEN AUTOMOTIVE, INC.; COUNTRY CLUB TRANS., INC.; LOCHMERE TAXI, INC.; MT. PLEASANT TAXI, INC.; CINEMA TAXI, INC.; GREEN & YELLOW TNC; ALEWIFE TRANS. CO., INC.; EASTERN TRANS., INC.; SILCOR TRANS. CO., INC.; ORMOND TRANS. CO., INC.; SOMERVILLE TRANS. CO., INC.; BABS CAB, INC.; TAXI MAINTENANCE, INC.; MAYBERRY TAXI, INC.,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC.; RASIER, LLC,

Defendants, Appellees,

TRAVIS KALANICK; GOVERNOR CHARLES BAKER; COMMONWEALTH OF MASSACHUSETTS; GARRETT CAMP,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Katzmann, Judge.*

---

Michelle H. Blauner, with whom Edward F. Haber, Ian J. McLoughlin, Adam M. Stewart, Patrick J. Vallely, and Shapiro Haber

---

* Of the United States Court of International Trade, sitting by designation.

-5-

& Urmy LLP were on brief, for appellants.

Karen L. Dunn, with whom Adam S. Gershenson, Timothy W. Cook, Elizabeth B. Prelogar, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Cooley LLP were on brief, for appellees.

---

August 6, 2021

---

**KATZMANN**, **Judge**.  Once upon a time, indeed, not all that long ago, the short route transportation market in Boston, as well as in many other cities, was dominated by taxicabs, which typically would be hailed on the street by riders.  In Boston, in a highly regulated system, taxicab operators are required to possess a license known as a "taxicab medallion," maintain a properly equipped and functioning taxicab, display a carriage license at all times, belong to an approved dispatch service or "radio association," and refrain from cell phone use while operating a taxicab.  Beginning in 2013, in Boston and surrounding communities as well as many other cities, this traditional taxicab business model was upended and the short route transportation industry radically transformed, with the entrance of transportation network companies ("TNCs") such as Uber, Lyft, and Sidecar.  The TNCs provide a digital tool for requesting private vehicle-for-hire by users who download a free mobile software application ("app").  Users who open the app on their mobile phones are shown a map of their location or designated pick-up point and the available affiliated vehicles in that vicinity.  These phone- and app-based for-hire transportation services, relying on drivers who provide pre-arranged transportation services in their own private vehicles, quickly overtook taxicabs in popularity.  The TNCs did not operate in accord with the rules governing taxicabs, and they did not incur the concomitant licensing and operating costs borne

by taxi medallion holders and duly licensed fleet owners. In Boston in 2013, there were no citywide regulations specifically addressing TNCs. It would not be until August 5, 2016, that the Massachusetts legislature authorized the operations of TNCs like Uber and also preempted municipalities from regulating TNCs through local regulation.

This case focuses on the period between June 4, 2013 (when UberX began operating) and August 5, 2016, a time of regulatory uncertainty and uncertain legal status for Uber and other TNCs. It involves a dispute brought in United States District Court in Boston by the plaintiffs, owners of the companies who dispatch, lease and maintain taxicab vehicles and own the taxi medallions (collectively "Anoush Cab"), against defendant Uber Technologies, Inc. (collectively, with its wholly-owned subsidiary Rasier LLC, "Uber"), a corporation that, as noted, has run a competing car service connecting drivers and travelers through its mobile phone application. Anoush Cab alleged that Uber competed unlawfully in the on-demand, ride-hail ground transportation market in and around Boston. Claiming damages of more than $122 million, Anoush Cab alleged that in violation of Boston regulations, Uber caused asset devaluation by (1) competing unfairly under Massachusetts General Law Chapter 93A ("Chapter 93A"); (2) violating the common law for unfair competition; and (3) aiding and abetting a conspiracy to engage in unfair

-8-

competition. After a bench trial, the district court issued final judgment against the plaintiffs on all their claims. Some now appeal. In considering that appeal, our charge is not to determine or opine on whether the introduction of TNCs like Uber was a good thing for the broader transportation industry or for the public at large. We are not called upon to determine whether Uber was virtuous in its conduct. Our responsibility is more narrow -- to determine whether Uber competed unfairly in violation of statutory and common law prohibitions governing the commercial marketplace. We conclude that the district court's judgment should be sustained.

## I.    BACKGROUND

### A.    Facts

We recite the facts as found by the district court, after considering the evidence presented at the bench trial, in a thorough Memorandum of Decision ("Decision"), Malden Transp., Inc. v. Uber Techs., Inc., 404 F. Supp. 3d 404 (D. Mass. 2019) ("Malden III").

The Anoush plaintiffs-appellants ("plaintiffs") are thirty-four corporations in the business of leasing City of Boston taxicabs (and medallions that authorize their use) to independent drivers. All thirty-four corporations are owned and operated by the Tutunjian family which collectively controls 362 medallions. The plaintiffs' taxicabs are branded under the name "Boston Cab."

-9-

Defendant-appellee Uber is a Delaware corporation with its principal offices in San Francisco, California. It is a technology company that, inter alia, uses an app to match up potential riders with drivers seeking customers for prearranged transportation. Uber began providing transportation services in Massachusetts in 2011, well before the launch of its disputed ridesharing or peer-to-peer ("P2P") service, UberX P2P. As has been noted, defendant-appellee Rasier is a wholly owned subsidiary of Uber. References to "Uber" operating as a TNC apply equally to Rasier.

### 1. Regulatory Framework

Historically, the City of Boston has regulated taxis under a set of municipal rules, ordinances and regulations ("Taxi Rules") and the Boston Police Commissioner ("the Commissioner") has the authority to regulate hackney carriages and stands. The Commissioner may delegate his authority to the Inspector of Carriages, who is the Commander of the Hackney Carriage Unit ("HCU" or "Hackney Unit"). The Hackney Unit has approximately twelve assigned police officers but typically only two of those officers serve on the street during any one shift.

In 2008, the Commissioner issued the Hackney Carriage Rules and Flat Rate Handbook ("Rule 403"), which regulates hackney carriage fares, medallions and hackney licenses, among other things. Rule 403 defines a "hackney carriage" as "[a] vehicle

used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston . . . . Also known as a taxicab or taxi."

Rule 403 sets forth leasing and shift rates and taximeter rates. It establishes various vehicle and driver requirements for hackney carriages, including that each vehicle have a taxi medallion, be driven by a licensed hackney carriage driver and bear evidence of membership in a radio dispatch association. Rule 403 also recognizes Boston's Vehicle for Hire Ordinance ("the Boston Ordinance") which provides, in relevant part: "no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purposes of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner." Boston, Mass. Mun. Code ch. 16 § 15.05(a) (2021).

From 2007 to 2008, the Hackney Unit issued tickets to unlicensed vehicles engaged in street hails (in violation of the Boston Ordinance), but not to vehicles conducting prearranged rides, regardless of whether the vehicles had livery plates. Indeed, the Commander of the Hackney Unit informed the Boston Police Commissioner and the Civilian Director of Hackney Licensing of the Hackney Unit's policy of not enforcing Rule 403 with respect to prearranged livery rides. The Commander of the Hackney Unit,

-11-

from January 2013 to May 2014, instructed his officers not to ticket ridesharing vehicles unless they were involved in street hails.

### 2. Nelson\Nygaard Report

In 2013, the Boston Globe ran a series of articles on the Boston taxi industry. Following that publication, Mayor Thomas Menino ("Mayor Menino") commissioned the Nelson\Nygaard Boston Taxi Consultant Report ("the Report").

Although Uber declined to participate in the preparation of the Report, the Commander of the Hackney Unit asked the drafters of the Report to address how the Hackney Unit should regulate ridesharing services such as those provided by TNCs. The Report, which was published in October 2013 (four months after Uber launched UberX P2P), concludes that TNCs and livery vehicles are not regulated and do not have a regulatory body providing oversight. It further recommended that the Mayor establish an independent Taxi Advisory Committee ("TAC").

Senior management at Uber read the Report when it was issued in October 2013 and concluded that it affirmed Uber's understanding that the Taxi Rules did not apply to ridesharing.

### 3. Ridesharing Competitors and UberX P2P

In March 2013, Sidecar, a competitor to Uber, began the first P2P ridesharing program in Boston. Uber's General Manager in Boston reported to the company's Head of Global Public Policy

that the Civilian Director of the Hackney Unit had purportedly stated that there was "almost no chance" that the Taxi Rules would be enforced against Sidecar.  That led senior Uber executives in Boston to believe that the Taxi Rules would not likely be enforced against Uber.

In April 2013, Uber publicly issued its national corporate policy ("the White Paper") with respect to P2P ridesharing in cities where regulatory enforcement was ambiguous. In the White Paper, Uber's then-CEO stated that "Uber will aggressively roll out ridesharing on its existing platform in any market where the regulators have given tacit approval. . . .  If a competitor is operating for 30 days without direct enforcement against transportation providers, then Uber will interpret that as 'tacit approval' of ridesharing activity."

In May 2013, Lyft, another Uber competitor began its P2P ridesharing service in Boston.  Following Lyft's entry into the Boston market, Uber accelerated its plan to launch its own P2P service, UberX P2P, which is the disputed conduct at issue in this case.  At that time, Uber's Boston General Manager was familiar with the Boston Ordinance and was specifically aware of the fact that violations could result in $500 fines.

On May 30, 2013, Uber's Head of Global Public Policy emailed Mayor Menino's Chief of Staff a letter which stated that Uber was "eager to participate in this innovative model" but only

"as long as regulators allow this type of transportation." He requested that the City keep Uber informed of any "changes to Boston's current policy of non-enforcement." That same day Uber's Head of Global Public Policy, having spoken with the Mayor's Chief of Staff, reported back to his Uber colleagues that the Chief of Staff said, "just launch." The following day, Uber's Head of Global policy asked the Chief of Staff to let Uber know if there were to be "any impending change to the City's interpretation or application of existing law in this area."

The City's lack of enforcement of the Taxi Rules against Uber competitors, public statements made after the launch, and the testimony from hackney officers collectively corroborated Uber's understanding of its communications with City officials prior to the launch of UberX P2P. Uber launched UberX P2P on June 4, 2013.

### 4. Requirements for UberX P2P Drivers

For P2P, Uber did not require its drivers to have a commercial hackney license, a commercial livery license or a hackney medallion. Drivers on the so-called "P2P platform" could drive their personal vehicles with a personal driver's license and a valid license plate. Those drivers were, however, covered by Uber's umbrella commercial insurance policy while transporting riders.

Uber's management knew that its UberX P2P ridesharing model would save Uber drivers thousands of dollars in fees in

comparison to taxicab drivers. At the time, the plaintiffs estimated that the annual cost of leasing a medallion in Boston was approximately $26,000, weekly radio association fees ranged from $20 to $88 and one-time retrofitting costs were around $3,600. By avoiding such fees, Uber expected its drivers to earn thirty percent more income than comparable taxicab drivers.

Unlike taxis, which are subject to fixed taxi fare rates, Uber set variable prices for how much a customer would be charged per ride. Uber engaged in "surge pricing," whereby Uber would charge more when customer demand was higher than driver supply. Unlike taxis, Uber was able to increase prices during periods of high demand and decrease them during periods of low demand.

In October 2013, Uber advertised to its customers that UberX P2P in Boston was thirty percent cheaper than comparable taxi rides.

### 5. Ticketing and Government Interactions

In July 2013, Uber became aware that some of its drivers were receiving citations from local law enforcement. During the conduct period, out of the millions of Uber trips, Uber drivers received 497 tickets, of which 277 cited the Boston Ordinance. Most of those tickets were issued between May 2014 and December 2014. In 2015, forty-six tickets were issued under the Boston Ordinance, but in 2016, only three tickets were issued.

In response to inquiries from drivers about citations received, Uber employees never told the drivers that UberX P2P was illegal. Rather, ticketed drivers were told that the officers were merely "misinformed" about Uber's commercial insurance policy and that they would submit the citations to Uber's legal team. Uber meticulously tracked its drivers' citations throughout the conduct period.

Uber reimbursed drivers who received tickets for prearranged rides but did not reimburse any drivers who were cited for street hails. It did so in order to retain drivers and to alleviate the cost and hassle of appealing the citations, although some drivers were successful in appealing citations on their own.

In 2014, the volume of citations reached its peak and Uber internally expressed serious concern. At the height of it, the Boston Police Department and the Massachusetts State Police were issuing tickets in the range of $500 to $20,000 per week.

In April 2014, Uber's Boston General Manager met with Massachusetts State Police officers overseeing Logan Airport who stated they would not relent on ticketing until there was a legislative change. One month later, however, Mayor Marty Walsh ("Mayor Walsh") in response to a caller inquiry on a Boston radio program stated that the police, and the City, did not have jurisdiction over Uber.

Uber management subsequently heard from one of its lobbyists that Mayor Walsh's Chief of Staff was "dumbfounded" as to why Uber drivers were being ticketed. He later requested that Uber provide him with information about the citations and Uber complied. Uber's General Manager had multiple conversations with the Chief of Staff about the driver citations and believed that the Chief of Staff was in the process of stopping the issuance of citations.

### 6. <u>Taxi Advisory Committee</u>

In July 2014, Mayor Walsh established the Taxi Advisory Committee ("TAC") to gather input from stakeholders in the transportation business to improve the taxi industry and to explore how the City of Boston might regulate other kinds of vehicles for hire. TNCs such as Uber and Lyft were invited to participate, along with members of the taxi industry, Massachusetts State Police, the Boston Police Department Hackney Unit and other City of Boston officials. Uber's General Manager participated in the TAC on behalf of Uber.

Although no City of Boston official ever told Uber that it was not allowed to operate in Boston, in November 2014, Uber's then-General Manager told her Uber colleagues that the Chair of the TAC and policy advisor to the Mayor made reference to the Taxi Rules during a conversation about how ridesharing may violate them. In December 2014, she testified at a Boston City Council hearing

on ridesharing. At that hearing, the Chair of the TAC reiterated that the goal of the TAC was to seek revisions to current regulations and to explore new regulations applicable to TNCs. Various Hackney Unit officials testified at the hearing that in their view Uber was not operating in compliance with the existing Taxi Rules.

### 7.   **BTOA Litigation**

In January 2015, the Boston Taxi Owners Association ("BTOA") sued the City of Boston for its nonenforcement of Rule 403. Bos. Taxi Owners Ass'n, Inc. v. City of Boston, 84 F. Supp. 3d 72 (D. Mass. 2015). In its opposition to BTOA's motion for preliminary injunction, the City of Boston stated that it "has not enforced Rule 403 against TNCs [and that] the public's interest is served by a for-hire transportation market full of choices. That market includes licensed taxicabs as well as buses, the Massachusetts Bay Transportation Authority ("MBTA"), jitney carriages, livery vehicles, and TNCs, among other types of transportation." City Defs.' Opp. To Mot. For Prelim. Inj., No. 15-cv-10100-NMG (D. Mass. Jan. 26, 2015), Dkt 20 at 4, 19 (emphasis in original).

The district court denied BTOA's motion for preliminary injunction and Uber followed that litigation closely. BTOA, 84 F.Supp.3d at 82.

### 8.   **Data Sharing Agreement**

In January 2015, Uber entered into a data sharing agreement with the City of Boston.  The agreement was designed to give the City access to information about rides for hire in Boston for the purposes of traffic control and urban planning, recognizing that, at that time, there were "tens of thousands of Uber rides on the streets of Boston every[ ]day."

### 9.   **State Regulations**

On January 2, 2015, the Massachusetts Department of Transportation ("MassDOT") issued final regulations with respect to TNCs, which took effect later that month.  The regulations amended 540 CMR § 2.05 to include a new category of vehicles, Personal Transportation Network Vehicles ("PTN Vehicles"), which are defined as "[a] private passenger motor vehicle that is used by a Transportation Network Company."  The regulations also state that the Massachusetts Department of Public Utilities ("DPU") "shall act as the licensing authority to which a TNC shall apply for a certificate to provide TNC services." 50 CMR § 2.05 (2015).

On February 4, 2015, Massachusetts Governor Charlie Baker ("Governor Baker") issued a press release directing the DPU to issue a public notice clarifying the status of TNCs in Massachusetts.  Press Release, Charlie Baker and Kathryn Polito, Governor and Lieutenant Governor, Comm. of Mass., Baker-Polito Admin. Issues Notice on Transp. Network Companies (TNCs) in Mass.

(Feb. 4, 2014), https://www.mass.gov/news/baker-polito-administration-issues-notice-on-transportation-network-companies-tncs-in. The press release stated that "[t]he issuance permits TNC drivers to continue operating in the Commonwealth, while allowing the administration to begin discussions about a regulatory framework to ensure the enhanced safety of drivers and riders . . . . But, because a TNC licensing framework must be developed through legislation, the RMV regulations allow TNC drivers to use private vehicles for a six-month period, during which the Baker administration will develop a licensing framework." Id.

Mayor Walsh was quoted in that same press release as stating that he would collaborate with Governor Baker on a comprehensive regulatory framework for TNCs and would share the City's TAC findings with respect to developing new city policies for TNCs. Uber representatives understood from the press release that Mayor Walsh supported the Baker administration in the effort to create a state-wide regulatory framework for TNCs.

On July 31, 2016, the Massachusetts legislature passed the Transportation Network Companies Act ("the TNC Act"), Mass. Gen. Laws ch. 159A ½, which authorizes the operation of TNCs like Uber and preempts municipalities from independently regulating them. The statute defines a TNC as an "entity that uses a digital network to connect riders to drivers to pre-arrange and provide

-20-

transportation." Mass. Gen. Laws ch. 159A ½ § 1.  The TNC Act
gives regulatory jurisdiction of TNCs to the DPU and the
Massachusetts Port Authority. See Mass. Gen. Laws ch. 159A ½ § 10
("[N]o municipality or other local or state entity, except the
Massachusetts Port Authority, may . . . subject a [TNC] to the
municipality's or other local or state entity's rates or other
requirements[.]").  Governor Baker signed the TNC Act into law on
August 5, 2016, but it was not to apply retroactively.  The
plaintiffs acknowledge that after enactment of the TNC Act, Uber
cannot, as a matter of law, violate the Boston Taxi Rules.

## B.    Procedural History

The plaintiffs filed suit on January 26, 2017 in Anoush
Cab, Inc. v. Uber Techs., Inc., 17-cv-10142-NMG.[1]  They alleged
that Uber was liable for common law unfair competition, violations
of Chapter 93A, aiding and abetting, and civil conspiracy, by
virtue of its operation of an illegal P2P ridesharing service
("UberX P2P" or "Uber Ridesharing") from June 4, 2013 to August
4, 2016 ("At-Issue Period") without the licensing required under
Boston's vehicle-for-hire laws.

On December 29, 2017, the district court denied the
defendants' motion to dismiss plaintiffs' claims. Malden Transp.,
Inc. v. Uber Techs., Inc., 286 F. Supp. 3d 264 (D. Mass. 2017)

---

[1] The Anoush action subsequently was consolidated with Malden
Transp., Inc. v. Uber, 16-cv-12538-NMG.

("Malden I").

On March 5, 2018, the plaintiffs filed an Amended Complaint. In its Answer, Uber asserted various affirmative defenses, including that it was not liable because Uber's actions were permitted practices under Mass. Gen. Laws ch. 93A, § 3 ("Permitted Practices Defense") and that the actions of others, and events unrelated to Uber, constituted intervening and superseding causes of the plaintiffs' harm ("Superseding Cause Defense"). Affirmative Defenses Nos. 8, 11.

The plaintiffs and Uber filed cross-motions for summary judgment concerning Uber's liability. The plaintiffs also moved for summary judgment on Uber's Permitted Practices and Superseding Cause Defenses. On July 3, 2019, the district court granted summary judgment to the plaintiffs on Uber's Permitted Practices Defense,[2] but otherwise denied the cross motions for summary judgment. Malden Transp., Inc. v. Uber Techs., Inc., 386 F. Supp. 3d 96 (D. Mass. 2019) ("Malden II"). The district court stated that at the jury-waived trial, it would consider "[w]hether Uber acted egregiously when it violated the Taxi Rules in violation of Chapter 93A;" "[w]hether plaintiffs suffered economic damages;" "[w]hether Uber's alleged unfairness/egregious

---

[2] Uber moved for reconsideration of the Order granting plaintiffs' summary judgment on Uber's Permitted Practices Defense. The Court denied reconsideration after trial. During trial, Uber withdrew its Superseding Cause Defense.

conduct caused plaintiffs' damages;" [and] "[w]hether Uber aided and abetted unfair conduct and/or engaged in a civil conspiracy to compete unfairly[.]" Id. at 106.

A bench trial was conducted between July 18 and August 2, 2019. On September 6, 2019, the district court issued its Memorandum of Decision ("Decision") determining that Uber was not liable to the plaintiffs under Chapter 93A, the common law of unfair competition, aiding and abetting and conspiracy.[3] Malden III, 404 F. Supp. 3d at 418-26 (COL ¶¶ 1-20, 42-45). The district court found that "Uber acted in accordance with the standard of the commercial marketplace" during a period of "regulatory ambiguity." Id. at 419, 422 (COL ¶¶ 6, 19). The district court also issued findings of fact that the plaintiffs' damages experts were unreliable, id. at 416-17 (FOF ¶¶ 72-74), the plaintiffs' lost profits analysis was unreliable, id. at 418 (FOF ¶¶ 75-76), and that quite apart from having not proven liability, the plaintiffs "failed to prove damages with reasonable uncertainty," id. at 422-24 (COL ¶¶ 21-30). The plaintiffs now appeal.

## II.  DISCUSSION

The plaintiffs contend that the district court erred as a matter of law in holding that Uber's conduct was not unfair within the meaning of Chapter 93A. They argue that the district

---

[3] The district court's Findings of Fact are cited herein as "FOF" and Conclusions of Law are cited herein as "COL."

court applied the wrong legal standards and relied upon legally impermissible factors when it concluded that Uber did not violate Chapter 93A and was not liable for unfair practices and methods of competition thereunder. They also claim that the district court erred in rejecting their asserted common law unfair competition claims, and conspiracy and aiding and abetting claims. Finally, they contend that the district court erred in concluding that they had failed to prove damages with reasonable certainty. We affirm.

## A.    Jurisdiction and Standard of Review

The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332 as the plaintiffs are Massachusetts corporations, defendants Uber Technologies, Inc. and Rasier LLC are foreign corporations doing business in Massachusetts, and the amount in controversy exceeds $75,000.

"As a federal court sitting in diversity, we look to state law, as articulated by the Supreme Judicial Court of Massachusetts, for the substantive rules of decision." Dumont v. Reily Foods Co., 934 F.3d 35, 40 (1st Cir. 2019) (citing Shaulis v. Nordstrom, Inc., 865 F.3d 1, 6 (1st Cir. 2017)). Following a bench trial on a Chapter 93A claim, we review the trial court's "legal conclusions de novo and factual findings for clear error." LimoLiner, Inc. v. Dattco, Inc., 919 F.3d 86, 90 (1st Cir. 2019); see also Baker v. Goldman, Sachs & Co., 771 F.3d 37, 49 (1st Cir. 2014) (quoting Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 34 (1st

-24-

Cir. 2007)). A ruling that conduct violates Chapter 93A "is a legal, not a factual, determination." Incase Inc. v. Timex Corp., 488 F.3d 46, 56 (1st Cir. 2007) (quoting R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 745 N.E.2d 668, 675-76 (Mass. 2001)); Baker, 771 F.3d at 49 (quoting R.W. Granger, 745 N.E.2d at 675). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a 93A violation is a question of law." Incase Inc., 488 F.3d at 57. (quoting Schwanbeck v. Fed.-Mogul Corp., 578 N.E.2d 789, 803-04 (Mass. App. Ct. 1991), rev'd on other grounds, 592 N.E.2d 1289 (Mass. 1992)); see also Baker, 771 F.3d at 49. "Under the clear error standard of review, we accept the district court's findings of fact unless, after careful consideration of the entire record, 'we are left with the definite and firm conviction that a mistake has been committed.'" Baker, 771 F.3d at 49 (quoting Vinick v. United States, 205 F.3d 1, 6 (1st Cir. 2000)). "If the district court's factual conclusions are based on an erroneous view of the controlling law, however, 'the case for deference vanishes,' and we review those conclusions de novo." Id.

### B.    The District Court Did Not Err in Its Chapter 93A Ruling

The plaintiffs contend that the district court erroneously applied an outdated "rascality" test and inapplicable "egregiousness standard," which they assert "has no place in

-25-

Chapter 93A claims premised upon established unfair competition standards." We first review the legal landscape. We then address whether the district court applied the correct legal standard to the evidence. Finally, we assess whether the district court's determination that Uber's conduct did not violate Chapter 93A was reasonable.

## 1. <u>Elements of Chapter 93A</u>

Chapter 93A "'is a statute of broad impact' that prohibits 'unfair methods of competition' and 'unfair or deceptive acts or practices in the conduct of any trade or commerce.'" <u>Exxon Mobil Corp.</u> v. <u>Attorney Gen.</u>, 94 N.E.3d 786, 791 (Mass. 2018) (quoting <u>Slaney</u> v. <u>Westwood Auto, Inc.</u>, 322 N.E.2d 768, 772 (Mass. 1975)); <u>see also</u> <u>LimoLiner, Inc.</u>, 919 F.3d at 90. Chapter 93A states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws ch. 93A, § 2(a) (2019). Unfair methods of competition and unfair or deceptive acts or practices are not defined in Chapter 93A. "[I]n construing paragraph (a). . ., the courts will be guided by interpretations given by the Federal Trade Commission [FTC] and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act [FTC Act]

(15 U.S.C. § 45(a)(1)), as from time to time amended."[4] Mass. Gen. Laws ch. 93A § 2(b) (2019). Chapter 93A also states that "[t]he attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter." Id. 2(c). The statute provides a cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . ." Id. § 11. A successful Chapter 93A § 11 claim thus has three elements: (1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered. Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1074-75 (Mass. 2014). The plaintiff must "establish both factual causation and proximate causation." LimoLiner, Inc., 919 F.3d at 90 (quoting Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016)). If successful, a plaintiff is entitled to actual damages, or double or treble damages if the defendant's violation

---

[4] The FTC Act broadly prohibits "[u]nfair methods of competition . . . and unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1)).

of § 2 was willful or knowing.  Mass. Gen. Laws ch. 93A, § 11 (2019).

The plaintiffs alleged in Count I of their amended complaint that "[b]y unlawfully operating their transportation services in Boston, and engaging in the acts and practices alleged herein, Defendants have engaged in unfair methods of competition in violation of M.G.L. c.93A, § 2." Although the Supreme Judicial Court has noted that in analyzing what constitutes unfair methods of competition under Chapter 93A, the court looks to interpretations by the FTC and the federal courts of section 5(a)(1) of the FTC Act, including statutes prohibiting anticompetitive conduct, see Ciardi v. F. Hoffmann La Roche, Ltd., 762 N.E.2d 303, 309-10 (Mass. 2002), in the district court the plaintiffs did not litigate their case by reference to those interpretations.  Rather, the litigation on the question whether Uber's conduct was unfair relied upon the universe of cases arising from cases proceeding under the unfair or deceptive practices prong of Chapter 93A.

Chapter 93A creates "broad new rights, forbidding conduct not previously unlawful under the common law of contract and tort or under a prior statute." Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997) (quoting Dodd v. Commercial Union Ins. Co., 365 N.E.2d 802, 806 (Mass. 1977)).  "A determination that conduct is unfair or deceptive is not dependent

-28-

on traditional tort or contract theories and represents a finding under a statute that creates new substantive rights." Id.; Drakopoulos v. U.S. Bank Nat'l Ass'n, 991 N.E.2d 1086, 1096 n.19 (Mass. 2013) ("Violation of a specific statute that does not itself permit private recovery may give rise to a private claim under c.93A if the violation amounts to an unfair method of competition.") (quoting Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., 780 N.E.2d 479, 483 (Mass. App. Ct. 2002)). To prove that a covered party has engaged in an "unfair or deceptive act or practice," it is "neither necessary nor sufficient that a particular act or practice violate common or statutory law." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009) (citing Kattar v. Demoulas, 739 N.E.2d 246, 257 (Mass. 2000)). That is to say, the fact that conduct violates statute or common law does not necessarily mean that it is "unfair or deceptive" so as to trigger liability under Chapter 93A. Id. On the other hand, conduct that does not violate statute or common law is not necessarily exempt from liability under Chapter 93A. Id.; see Renovator's Supply, Inc. v. Sovereign Bank, 892 N.E.2d 777, 787 (Mass. App. Ct. 2008).

As noted, Chapter 93A does not define what constitutes an "unfair or deceptive practice." The Supreme Judicial Court has observed that "[s]uch a definition would be impossible, because, as the Appeals Court aptly noted, '[t]here is no limit to human

inventiveness in this field.'" Kattar, 739 N.E.2d at 257 (first citing Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979); and then quoting H.R. Rep. No. 63-1142 (1914) (Conf. Rep.)). Although section 2(b) of Chapter 93A states that courts are to be guided by the Federal Trade Commission and federal court interpretations of the Federal Trade Commission Act, unfair or deceptive conduct is best discerned "from the circumstances of each case." Id. (quoting Comm. v. DeCotis, 316 N.2.2d 748, 754 (Mass. 1974)). Section 11 "does not contemplate an overly precise standard of ethical or moral behavior" but rather implies "the standard of the commercial marketplace." Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir. 1996) (quoting Shepard's Pharmacy, Inc. v. Stop & Shop Cos., 640 N.E.2d 112, 115 (Mass. App. Ct. 1994)). "The courts are not invited by the statute to punish every departure from 'the punctilio of an honor the most sensitive', but they may enforce standards of behavior measurably higher than perfidy." Doliner v. Brown, 489 N.E.2d 1036, 1040 (Mass. App. Ct. 1986) (Kaplan, J.) (quoting Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928)).

The Massachusetts courts have wrestled with the description of unfair conduct, the first element of a Chapter 93A claim, for decades. Because the genealogy of the governing Chapter 93A legal standard informs our analysis of plaintiffs' claim of error, we trace it, as we did in Baker, 771 F.3d at 50-51. The

Chapter 93A unfairness test was first articulated in PMP Assocs., Inc. v. Globe Newspaper Co. in 1975 and became known as the "PMP" test.  321 N.E.2d 915 (Mass. 1975).  There the Supreme Judicial Court held that to establish an unfair trade practice under Chapter 93A, three factors must be present: the practice must (1) be "within at least the penumbra of some common-law, statutory, or other established concept of unfairness;" (2) be "immoral, unethical, oppressive, or unscrupulous"; and (3) "cause[ ] substantial injury to consumers (or competitors or other businessmen)."  Id. at 917.

Four years later, in 1979, faced with the question whether a  breach of contract could give rise to liability under Chapter 93A § 11, Justice Kass of the Massachusetts Appeals Court crafted the "rascality test" in Levings, 396 N.E.2d at 153, which provided that: "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."[5]  As his colleague Justice Kaplan would comment, "[w]e tried to suggest a mood, although we could not prescribe a rule[.]"  Doliner, 489 N.E.2d at 1040.  In 1992, the Appeals Court, again per Justice Kass, further

---

[5] Justice Kass was a renowned wordsmith.  See Bryan Marquard, Rudolph Kass, Judge Whose Writing Flair Illuminated Legal Principles, Dies at 90, Boston Globe, June 13, 2021, https://www.bostonglobe.com/2021/06/13/metro/rudolph-kass-judge-whose-writing-flair-illuminated-legal-principles-dies-90/.

ruled that successful invocation of Chapter 93A in a breach of contract case required that the conduct have "an extortionate quality that gives it the rancid flavor of unfairness." Atkinson v. Rosenthal, 598 N.E.2d 666, 670 (Mass. App. Ct. 1992). In 1995, the Supreme Judicial Court of Massachusetts supplanted both phrases -- that is, "level of rascality" and "rancid flavor of unfairness" -- choosing instead to "focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a [Chapter 93A] fairness determination." Mass. Emp'rs Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995) (citing PMP Assocs., Inc., 321 N.E.2d at 917). We noted Massachusetts' departure from this language in Baker, a negligence and negligent misrepresentation case, where we observed that after Propac-Mass the Supreme Judicial Court has held that "mere negligence," is not sufficient for a violation of Chapter 93A, instead requiring "something more" -- namely "extreme or egregious" negligence. 771 F.3d at 51 (first citing Klairmont v. Gainsboro Rest., Inc., 987 N.E.2d 1247, 1257 (Mass. 2013); and then citing Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1032 (Mass. 2004)). Accordingly, "our Circuit has . . . followed the Massachusetts courts' lead in using the term 'egregious' to state the standard of Chapter 93A liability." Id. (collecting cases); see also Bank of Am., N.A. v. Prestige Imports, 917 N.E.2d 207, 229 (Mass. App. Ct. 2009)("A 'breach of a legal obligation

under commercial law, without more, does not amount to an unfair or deceptive act under G.L. c. 93A.'")(quoting Framingham Auto Sales, Inc. v. Workers' Credit Union, 671 N.E.2d 963, 965 (Mass. App. Ct. 1996)). Occasionally, the Massachusetts courts and the First Circuit have noted "rascality" in reference to the Chapter 93A extreme or egregious standard. See, e.g., Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802 F.3d 39, 54 (1st Cir. 2015) (first citing Baker, 771 F.3d at 49-51; then citing Zabin v. Picciotto, 896 N.E.2d 937, 963 (Mass. App. Ct. 2008)). Those cases do not diverge from the Chapter 93A principle that "something more" and rising to the level of extreme or egregious conduct is required for a successful Chapter 93A claim. See Baker, 771 F.3d at 51-52.

## 2. The District Court's Statement of The Chapter 93A Standard

In the proceedings below, the plaintiffs contended, and proposed as a Conclusion of Law for the district court, that "Uber's violation of the Boston Rules falls within the penumbra of a common law, statutory or other established concept of unfairness that c. 93A's prohibition of unfair competition is designed to remedy. Malden [I], 286 F. Supp. 3d at 274." Anoush Plaintiffs' Proposed Conclusions of Law ("Proposed Conclusions of Law"), ¶ 316 (citation in original). The plaintiffs also asked the district court to determine that "Uber's unlicensed competition was immoral, unethical, oppressive, and/or unscrupulous, and gave Uber an unfair competitive advantage over taxi owners; in other words,

-33-

it was egregious. Plaintiffs presented at trial multiple, independent strands of evidence, each of which confirm Uber's conduct was egregious, and when considered together, plaintiffs' evidence of egregiousness is overwhelming." Id. ¶ 321. The plaintiffs then asked the district court to conclude: "In fact, both the First Circuit and the Supreme Judicial Court have held that even 'negligent [conduct] may be so extreme or egregious as to constitute a violation of Mass. Gen. Laws ch. 93A, § 11. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 61 (2004); Baker v. Goldman Sachs & Co., 771 F.3d 37, 51 (1st Cir. 2014).'" Id. ¶ 322. In sum, the plaintiffs did not dispute the applicability of the "egregiousness" standard to the unfair methods of competition action before the district court, and indeed cited precedent arising from cases involving unfair and deceptive practices.

Before us, the plaintiffs are debuting a new theory, arguing that the district court applied an "inapplicable 'egregiousness' standard, which has no place in Chapter 93A claims premised upon established unfair competition standards." The plaintiffs' new view runs afoul of two established principles. First, "[a]n appellant cannot change horses in mid-stream, arguing one theory below and a quite different theory on appeal." Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010). Second, "[i]t is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." Ellis v.

-34-

Fidelity Mgmt. Tr. Co., 883 F.3d 1, 8 and n.4 (1st Cir. 1991)

(quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir.

1991)).  In short, the plaintiffs' new position is not properly

before us.[6]

---

[6] Although the plaintiffs now assert that in analyzing what
constitutes unfair methods of competition under Chapter 93A, the
court should look to interpretations by the FTC and the federal
courts of section 5(a)(1) of the FTC Act, including statutes
prohibiting anticompetitive conduct, the plaintiffs did not do so
below.  The only time they referenced the FTC Act in their Proposed
Conclusions of Law was when presenting federal judicial decisions
in support of the contention that good faith is not a defense to
a determination of liability under Chapter 93A.  Proposed
Conclusion of Law ¶ 337.  Nowhere in those Proposed Conclusions of
Law did they advance the claim that under the FTC Act and judicial
decisions under the FTC Act, Uber's conduct constituted unfair
methods of competition.  For the reasons set forth above, they
cannot assert those theories and claims for the first time on
appeal.  We thus do not reach them.
   Even so, while cases turn on their own facts, it can be
observed that other jurisdictions have rejected claims of anti-
competitive conduct lodged against Uber based on violations of
federal statutes.  Concluding that the federal laws prohibiting
anticompetitive conduct are designed to protect competition, not
competitors, and will be deemed violated where there is harm to
the market, and thereby to the consumer, the Third Circuit rejected
claims that Uber's entrance into the Philadelphia market was anti-
competitive.  Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc., 886
F.3d 332, 340 (1st Cir. 2018) ("[I]nundating the Philadelphia
taxicab market with Uber vehicles, even if it served to eliminate
competitors was not anticompetitive.  Rather, this bolstered
competition by offering customers lower prices, more available
taxicabs, and high-tech alternatives to the customary method of
hailing taxicabs and paying for rides.")(emphasis in original);
see also Ill. Transp. Trade Ass'n. v. City of Chi., 839 F.3d 594,
597 (7th Cir. 2016) ("Taxi medallions authorize the owners to own
and operate taxis, not to exclude competing transportation
services.").  The plaintiffs did not present market evidence at
trial, and apparently were of the view that they did not need to
establish harm to the consumer.  Proposed Conclusion of Law ¶ 333
n.9.  In any event, we do not reach or address the plaintiffs'
newly and untimely asserted theories and argument.

However, we do address the plaintiffs' contention that the district court erroneously applied an outdated "rascality" standard to assess liability under Chapter 93A. The plaintiffs mischaracterize the district court's articulation of the standard. The district court stated that "[s]pecifically, the challenged misconduct must rise to the level of an extreme or egregious business wrong, commercial extortion, or similar level of rascality that raises an eyebrow of someone inured to the rough and tumble of the world of commerce." What is clear from the district court's articulation of the governing standard, set forth in full in the footnote below,[7] is that the touchstone of the

---

[7] The district court stated:

> Rather, to establish unfairness under Chapter 93A, § 11, plaintiffs must prove that the alleged unlawful conduct falls within at least the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers [or business entities]. Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 94 N.E.3d 786, 792 (2018); see also Manning v. Zuckerman, 388 Mass. 8, 444 N.E.2d 1262, 1264 (1983) (noting that "Section 11 provides a private cause of action to a person who is engaged in business and who suffers a loss as a result of an unfair or deceptive act or practice by another person also engaged in business") (internal quotations omitted). Specifically, the challenged misconduct must rise to the level of an extreme or egregious business wrong, commercial extortion, or similar level of rascality that raises an eyebrow of someone inured to the rough and

district court's Chapter 93A analysis is extreme or egregious business conduct.  Considered against the legal landscape, the district judge's explication was not in error.

### 3.    The Application of the Governing Legal Standard to the Facts

We now turn to the district court's application of the Chapter 93A standard to the facts as it found them. Under the prevailing standard, as we will explain, the district court's findings of fact were not clearly erroneous. The district court determined:

> Although the plaintiff corporations compete with Uber for riders in the for-hire vehicle industry, they have failed to prove that Uber, under the totality of the circumstances, committed an extreme or egregious wrong when they launched and continued to operate UberX

tumble of the world of commerce. Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802 F.3d 39, 54 (1st Cir. 2015) (citing Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (Kass, J.)).

In making that unfairness determination under § 11, courts consider the totality of the circumstances (Duclersaint v. Fed. Nat. Mortg. Ass'n, 427 Mass. 809, 696 N.E.2d 536, 540 (1998)), which includes the "nature of challenged conduct and [ ] the purpose and effect of that conduct" (Peabody Essex Museum, Inc., 802 F.3d at 54), "the standard of the commercial marketplace" and "the equities between the parties, including what both parties knew or should have known." Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir. 1996) (internal citations and quotations omitted).

Malden III, 404 F. Supp. 3d at 418-19 (COL ¶¶ 3-4).

-37-

P2P in Boston, Massachusetts throughout the conduct period. COL ¶ 5.

Because the City did not inform Uber that it was forbidden from operating its ridesharing services and Uber entered the ridesharing market only after becoming aware of the operation of other ridesharing companies (such as Sidecar and Lyft) in Boston without consistent observance of the Taxi Rules, the Court concludes that Uber acted in accordance with the standard of the commercial marketplace. See Ahern, 85 F.3d at 798. COL ¶ 6.

Malden III, 404 F. Supp. 3d at 419.

We conclude that the district court did not err in its determination that Uber acted in accordance with the standard of the commercial marketplace. We are persuaded by the court's marshalling of the facts in reaching its determination, both regarding Uber's initial entrance and its continuing activities.[8]

---

[8] The district court reasonably determined, Malden III, 404 F. Supp. 3d at 413-14, 419-21, that Uber:

Monitored the City's apparent interpretation and application of the Taxi Rules and the lack of enforcement against competitors that launched competing services before Uber, COL ¶ 6;

Published and sent its White Paper -- outlining Uber's principled approach to entering markets with ridesharing competitors -- to City Hall, explaining that it viewed non-enforcement against competitors as a form of governmental approval prior to launch, COL ¶ 7;

Shared with Mayor Menino's Office its plan to launch UberX and was told "just launch," id.;

Read the 2013 Nelson/Nygaard Report that concluded TNCs were not regulated by the Taxi Rules, COL ¶ 10(a);

Listened to Mayor Walsh's interview stating that the

The district court noted that "[b]y announcing its corporate policy of tacit regulatory approval and specifically informing Mayor Menino's office about that new policy (to which the Mayor's Office responded, 'just launch'), Uber avoided acting 'unscrupulously' or with the level of 'rascality' necessary to sustain a Chapter 93A claim." Id. at 419 (COL ¶ 7). Furthermore, "Uber's attempt to

City did not have jurisdiction over Uber and was working on new regulations, COL ¶ 10(b), (f);

Participated in the City's Taxi Advisory Committee "to explore how the City might regulate other kinds of vehicles for hire" like TNCs; FOF ¶ 50; COL ¶ 10(c);

Communicated with Mayor Walsh's Chief of Staff, who was "genuinely disturbed" about ticketing of prearranged rides on the Uber platform, which was "contrary to the understanding of the Mayor," COL ¶ 13;

Followed the Boston Taxi Owners Association case in which the City opposed the taxi industry's motion for preliminary injunction to compel the City to enforce Rule 403 and the Boston Ordinance against Uber, FOF ¶ 54; COL ¶ 10(d);

Entered a data-sharing agreement that made the City aware that there were "tens of thousands of Uber rides on the streets of Boston every day," FOF ¶ 55;

Read Governor Baker's February 2015 press release that new statewide regulations "permit[ted] TNC drivers to continue operating in the Commonwealth," FOF ¶ 58;

Issued jointly with Governor Baker an April 2015 press release indicating that the regulations "ensure[d] current [TNC] operations are not disrupted" during a "Phase-In Period" which "allow[ed] TNC drivers to operate with private registration and service," FOF ¶ 62; COL¶10(f); and

Complied with DOT regulations permitting TNCs to operate during the Phase-In Period, including obtaining the required periodic notices from DPU stating that it was not yet issuing TNC certificates, COL ¶ 10(g).

clarify the regulatory applicability of the Taxi Rules with the City prior to the launch and thereafter was sufficiently transparent and consistent with the standard of the marketplace." Id. (citing Cablevision of Bos., Inc. v. Pub. Improvement Comm'n of City of Bos., 184 F.3d 88, 94, 106 (1st Cir. 1999)). We agree with the district court that the fact "[t]hat the City failed to take a definitive regulatory position publicly does not render Uber's response an 'extreme or egregious business wrong.'" Id. at 419-20 (quoting Peabody Essex Museum, 802 F.3d at 54) (COL ¶ 8). As the district court summarized: "Accordingly, Uber's entry into the market was not 'unfair' or 'unscrupulous' when Uber 1) was not the first 'unlawful' entrant, 2) thereafter competed in response to changing marketplace conditions and 3) sought to inform regulators that it intended to enter the market." Id. at 420 (COL ¶ 9).

With respect to the post-launch operations, we do not discern error in the district court's conclusion, supported by a variety of facts, that Uber "continued to operate in accordance with statements and actions of government officials" and that "the continued interaction and ongoing working relationship between Uber management and City officials make it clear that the City was aware of Uber's P2P operations but chose not to prohibit it." Id. (COL ¶¶ 10, 11). While the plaintiffs continue to argue that the Boston Ordinance citation issued by individual officers to

individual drivers was evidence of unfair practice by Uber, we note the district court's finding that "[o]ut of some 29 million Uber trips taken during the conduct period, 497 citations [less than 0.001% of all Uber rides] issued to Uber drivers represented a relatively insignificant violation of the Taxi Rules." Id. at 421 (COL ¶ 12). Moreover, Mayor Walsh had "publicly stated that the City lacked jurisdiction over Uber" and that when Uber itself reached out to the Mayor's Chief of Staff, he "was genuinely disturbed about the officers' continued ticketing of prearranged rides through the Uber platform, contrary to the understanding of the Mayor." Id. (COL ¶ 13).

Even accepting that Uber's rides were in violation of the Taxi Rules, we would note again that an unlawful action is not a per se violation of Chapter 93A. See Mechs. Nat'l Bank of Worcester v. Killeen, 384 N.E.2d 1231, 1237 (Mass. 1979) ("[N]ot every unlawful act is automatically an unfair . . . one under G.L. c. 93A."). A violation of statutory or common law is not "sufficient" to constitute a 93A violation. Mass. Eye & Ear Infirmary, 552 F.3d at 69. Here, the district court reasonably concluded that in the context of the communications and dealings with City officials, reflected by both affirmative and tacit reinforcement of Uber's operation, the conduct could not be categorized as the "egregious" unfairness that is required by § 11 of Chapter 93A:

-41-

> Uber's decision to enter the transportation market and continue to operate was informed by a totality of positive statements received from the City both before and during the conduct period. It leveraged regulatory ambiguity, its growing popularity among consumers, its ability to charge less than taxis and its knowledge that regulators would be reluctant to thwart the growth of a popular consumer product which afforded independent drivers better hourly wages. That strategy, while aggressive and disruptive to the for-hire transportation market, is competition consistent with the "rough and tumble of the world of commerce."

Malden III, 404 F. Supp. 3d at 422 (COL ¶ 19) (quoting Peabody Essex Museum, Inc., 802 F.3d at 54).

The district court noted: "To be clear, the Court does not conclude that Uber acted altruistically or in the best interest of the transportation industry as whole." Id. at 421 (COL ¶ 12). We agree with that observation. We also conclude that based on the totality of the circumstances, the district court reasonably determined that the plaintiffs did not prove that defendants acted with the requisite, heightened standard of unfairness under § 11 of Chapter 93A and therefore the defendants are not liable to the plaintiffs. Id. at 422.[9]

---

[9] Although the plaintiffs assert otherwise, the district court never held "that because Uber had shown that it acted in good faith it had no liability." Quite to the contrary, the district court, citing Duclersaint, 696 N.E.2d at 540, stated that the question of "'good faith' (or the lack thereof)" was not substantively relevant, but rather was considered for the "purpose of determining whether Uber's conduct can be found to be 'egregious' in light of the surrounding circumstances." Malden III, 404 F. Supp. 3d at

## C. **The District Court Did Not Err in Rejecting the Common Law Claims**

### 1. **Common Law Unfair Competition**

The plaintiffs contend that the district court erred in dismissing their common law unfair competition claim, alleged in Count II, that "[b]y unlawfully operating their transportation services in Boston, without complying with Massachusetts and Boston laws, Defendants unfairly competed with Plaintiffs." We disagree.

The defendants note that the district court determined that the plaintiffs did "not distinguish between the legal standard for their common law and statutory [i.e. 93A] claims." Malden II, 286 F. Supp. 3d at 273 n.2. They point to various pleadings by the plaintiffs which might very well have led the district court to so find. The defendants argue that having represented below that that the claims were coextensive, the plaintiffs cannot now claim on appeal that the district court erred by concluding that because "plaintiffs have not proven their Chapter 93A claim, their common law claim for unfair competition fails as well." Malden III, 404 F. Supp. 3d at 426 (COL ¶ 42); see P.R. Hosp. Supply,

421 (COL ¶ 14). Similarly, the district court stated that "evidence offered by Uber that it acted consistently with government representations is not considered by the court as a 'state of mind' or 'reliance' defense to unfairness, as plaintiffs assert." Id. at 422 (COL ¶ 18). We conclude that the district court's determinations were properly drawn from the totality of the circumstances.

Inc. v. Bos. Sci. Corp., 426 F.3d 503, 505 (1st Cir. 2005) (quoting Austin v. Unarco Indus., Inc., 705 F.2d 1, 15 (1st Cir. 1983)) ("[A] party may not appeal from an error to which he contributed, either by failing to object or by affirmatively presenting to the court the wrong law."). The plaintiffs, however, assert that it was not their position that the Chapter 93A and unfair competition claims were coextensive. Rather, they contend that they had argued that Uber's unlicensed competition in violation of legislated licensing requirements which caused the plaintiffs' injury, without more, established Uber's liability for unfair competition. They point to their Proposed Conclusion of Law, which stated: "'bad faith,' egregiousness, or any other form of unfairness aside from competing without a license against a licensed competitor, is not an element of a claim for common law unfair competition." Proposed Conclusion of Law ¶ 378.

We need not resolve these dueling perceptions. Addressing the merits, we are not persuaded by the plaintiffs' argument that Uber is liable for unfair competition because it violated statutes enacted to protect the plaintiffs from unauthorized competition. The plaintiffs' reliance on Mass. Soc. of Optometrists v. Waddick, 165 N.E.2d 394 (Mass. 1960), is misplaced. There, in rejecting an unfair competition claim brought by practicing optometrists regarding the unlicensed practice of

-44-

opticians, the Supreme Judicial Court quoted Restatement (First) of Torts § 710:

> One who engages in a business or profession in violation of a legislative enactment which prohibits persons from engaging therein, either absolutely or without a prescribed permission, is subject to liability to another who is engaged in the business or profession in conformity with the enactment, if, but only if, (a) <u>one of the purposes of the enactment is to protect the other against unauthorized competition</u>, and (b) the enactment does not negative such liability.

<u>Id.</u> at 395-96 (emphasis added). In the case before us, the relevant question is whether taxicab legislation, and Taxi Rule 403 invoked by the plaintiffs, are intended to protect against unauthorized competition. While protection from competition need not be the only purpose, the plaintiffs have not shown that the taxicab regulations allegedly violated by Uber were enacted to protect against unauthorized competition. Indeed, in a case involving taxicab stands, the Supreme Judicial Court had occasion to determine the purpose of the statutory limitation on Boston hackney licenses. See <u>Town Taxi Inc.</u> v. <u>Police Comm'r of Bos.</u>, 387 N.E.2d 129 (Mass. 1979). Reviewing the legislative history, including the Report of the Special Commission on Licensing of Taxicab Stands in Boston from 1930, the Supreme Judicial Court noted that the initial enacted statute deleted a limitation on licenses that had been inserted in response to the Special Commission's recommendation that the number of licenses be limited

to "prevent 'unreasonable and destructive competition.'" Id. at 134-35 (citation omitted). Three years later, the Legislature authorized the Boston Police Commissioner to limit the number of licenses on a different ground -- for "public convenience and necessity." Id. at 135. In short, given the stated regulatory purpose of "public convenience and necessity," and their inability to point to a legislative grant to restrain competition, plaintiffs cannot find support from § 710, referenced in Waddick, for their common law claim.[10]  165 N.E.2d at 395-96.

_____

[10] Moreover, we express some doubts here as to whether a common law unfair competition claim is appropriate, given that in Massachusetts such a claim appears to be limited to consumer confusion cases, which involve "palming off" or "passing off." See Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc., 820 F.3d 36, 44-45 (1st Cir. 2016) (quotation omitted). See also Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 17 (1st Cir. 2002) (noting that "the term 'unfair competition' in Massachusetts law" has a "well-settled meaning" and that "[i]t is settled in Massachusetts that 'the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services.'") (quoting Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760 (1986)); Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 157-58 (1989) ("With some notable exceptions . . . the common-law tort of unfair competition has been limited to protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning such that they operate as a designation of source."). Anoush Cab has introduced no evidence at the district court nor here to show consumer confusion or palming off, nor does the presented evidence of Uber's activities give rise to any inference of palming off (i.e. that Uber passed UberX rides off as medallion taxicab rides). This further convinces us that Anoush Cab's common law unfair competition claim should fail.

## 2. **Other Common Law Claims**

We conclude that the district court did not err in entering judgment for Uber on the plaintiffs' aiding and abetting (Count III) and conspiracy (Count IV) claims. Malden III, 404 F. Supp. 3d at 426 (COL ¶ 42). Claims alleging aiding and abetting or civil conspiracy require proof of an underlying tort. See Taylor v. Am. Chemistry Council, 576 F.3d 16, 34-35 (1st Cir. 2009). The plaintiffs failed to prove an underlying tort; the district court was thus correct in rejecting, as matter of law, the plaintiffs' claim that Uber aided and abetted drivers' violations of the Boston Ordinance and Taxi Rules. Malden III, 404 F. Supp. 3d at 426 (COL ¶ 45). Furthermore, Chapter 93A does not contain a separate aiding and abetting cause of action, and we find it unlikely one exists. See In re TelexFree Sec. Litig., 360 F. Supp. 3d 46, 49 (D. Mass. 2019) ("Chapter 93A . . . does not recognize a separate aiding and abetting cause of action."). See also Cent. Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 175-77 (1994) (focusing on whether a statute explicitly provides for aiding and abetting liability). In any event, Anoush Cab's Chapter 93A claim fails for the reasons already discussed. Common law unfair competition, on the other hand, more obviously qualifies as an underlying tort, but again we have already shown that such a claim fails, and thus the aiding and abetting claim must also fail.

With respect to coercive conspiracy,[11] we note, as did the district court that it is a rare cause of action. Malden III, 404 F. Supp. 3d at 426 (COL ¶ 44) (citing Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994)). The plaintiffs must demonstrate that the defendants "had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." Id. A case that Anoush Cab cites, Sexual Minorities Uganda v. Lively, notes that under the "more exceptional" coercive conspiracy theory, the power of coercion must also be "peculiarly focused against" the plaintiff. 960 F. Supp. 2d 304, 333 (D. Mass. 2013) (quoting Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 245 (D. Mass. 1999). We also agree with the district court that "consistent with [the] conclusion that defendants did not act 'unfairly' under Chapter 93A," "flooding the market with Uber drivers does not amount to the kind of 'coercion' anticipated by this narrow cause of action." Malden III, 404 F. Supp. 3d at 426 (COL ¶ 44).

## D. **Damages**

At the bench trial, the plaintiffs presented expert witness testimony by Dr. Michael Williams and John Weeden in

---

[11] The plaintiffs alleged only a common-plan conspiracy, and not coercive conspiracy. Count IV, ¶ 119. As the district court also addressed the latter claim, we do so as well.

support of their claim that the introduction of Uber in violation of unfair practices and competition resulted in economic injury in the form of lost medallion values in the sum of $124,023.734,[12] and lost profits in the sum of $10,777,855. The plaintiffs acknowledge that they were required to prove damages with "reasonable certainty." See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 19 (1st Cir. 2009) (quoting Nestle Food Co. v. Miller, 836 F. Supp. 69, 78 (D.R.I. 1993)). Although the district court had concluded that "Uber is not liable to plaintiffs under Chapter 93A, it proceed[ed], nevertheless, to making findings of fact on . . . damages for the sake of completeness." Malden III, 404 F. Supp. 3d at 415 (emphasis omitted). The district court thus issued findings of fact that the testimony put forth by the plaintiffs' damages experts was unreliable. Id. at 416-18. Williams offered two regression models purportedly designed to prove losses in medallion values and leasing revenues. The district court found Williams' damages presentation "flawed" and "unreliable" because, inter alia, Williams "generated inaccurate price predictions"; failed to account for "regulatory events" that can decrease medallion values; and gave "inconsistent" trial testimony,

---

[12] The district court found that "[o]n June 4, 2013, the average price for taxi medallions in Boston . . . was $637,500 per medallion. The highest price paid for a medallion was $700,000 in 2014. On August 4, 2016, the going price of Boston taxi medallions was approximately $250,000." Malden III, 404 F. Supp. 3d at 416 (FOF ¶ 70).

including a "dramatic reduction" that suddenly, with no explanation, cut the claimed medallion value damages in half. Id. at 416-17 (FOF ¶¶ 72-74).

With respect to the lost profits analysis put forth by Weeden, the district court found that it was also unreliable because it relied on one of Williams' unreliable models, and "unrealistically assumed that plaintiffs' medallions would be leased 24 hours per day, 7 days per week, with 100% utilization in 12-hour shifts." Id. at 418 (FOF ¶¶ 75-76). The district court concluded that even if plaintiffs "had proved liability (which they have not) . . . . [b]ecause [their] calculation of damages for reduced medallion value and lost profits are based upon unreliable and flawed regression models, plaintiffs have failed to prove damages with reasonable certainty." Id. at 422-24 (COL ¶¶ 21-30). The district court further found that plaintiffs' damages calculations failed to "disaggregate the regulatory impacts," and thus "impermissibly" sought to recover damages tied to Uber's constitutionally protected right to petition the government, in violation of the Noerr-Pennington doctrine. Id. at 424 (COL ¶ 32).

On appeal, the plaintiffs contend that the district court's analysis of the testimony regarding damages was incorrect and that based on the undisputed evidence, we should enter judgment in their favor in the amount of $122,350.49. Although

we would conclude on review that the district court's analysis of the deficiencies in testimony regarding damages should be sustained, we do not need to reach the question of damages because the plaintiffs have not established liability by the defendants. "It is settled law that when liability has been resolved against a plaintiff, any claims of error relating exclusively to damages are moot." Campbell v. Ackerman, 903 F.3d 14, 19 (1st Cir. 2018) (collecting cases). We thus "need not reach the issue related to the damages award." A.M. Capen's Co., Inc. v. Am. Trading and Prod. Corp., 202 F.3d 469, 471 n.3 (1st Cir. 2000).

### III. CONCLUSION

As we have noted, the introduction of TNCs has upended the transportation industry. The ensuing transformation of that industry has been the subject of intense debate.[13] There has been

---

[13] See, e.g., Massachusetts Area Planning Council, The Growing Carbon Footprint of Ride-hailing in Massachusetts (July 2019), https://www.mapc.org/wp-content/uploads/2019/07/Growing-Carbon-Footprint-of-Ride-hailing-in-MA.pdf;
Institute for Transportation and Development Policy, Ride Fair: A Policy Framework for Managing Transportation Network Companies (2019) https://www.itdp.org/wp-content/uploads/2019/03/2019.03.13.TNC-Policy.V9.pdf;
Craig A. Leisy, Transportation Network Companies and Taxis: The Case of Seattle (2019); B. Schaller, The New Automobility: Lyft, Uber and the Future of American Cities, Schaller Consulting (July 25, 2018) http://www.schallerconsult.com/rideservices/automobility.pdf;
S. Roy, A. Komanduri & K. Prossaloglou, Evolution of Transportation Network Companies and Taxis through 2013-2018 in Chicago, 2674 Transportation Research Record 7, 385-397 (2020) https://journals.sagepub.com/doi/full/10.1177/0361198120922851.

vigorous argument whether the new world created by TNCs has been good for the transportation industry as a whole or for the larger public; dispute regarding the impact of TNCs on road congestion and public transit usage; questions whether TNCs are being regulated appropriately in the best interests of public safety; and debate whether the legislature acted sufficiently, or should have acted, to protect the interests of taxicab owners who were affected by the TNCs. These are no doubt important issues of public policy. However, they are not before us or within our province of decision. Rather, as we observed at the outset, we are faced with the narrow question of whether Uber's entrance and conduct in the transportation market during a period of regulatory uncertainty violated the statutory and common law governing the commercial marketplace, as presented in the district court. For the reasons set forth above, we conclude that it did not. Accordingly, the judgment of the district court is <u>affirmed</u>.